**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **ALBERTO MARTINEZ, and** | § | |
| **EMILIO ZAMORA,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **Civil Action No. 1:23-CV-1574** |
| | § | |
| **UNIVERSITY OF TEXAS AT** | § | |
| **AUSTIN, and JAY HARTZELL,** | § | |
| **In his official and individual capacity,** | § | **Jury Requested** |
| **Defendants** | § | |

_____

## FIRST AMENDED COMPLAINT

## NATURE OF THE ACTION

1.      Plaintiffs Alberto Martinez ("Martinez"), and Emilio Zamora ("Zamora") (collectively "Plaintiffs"), individually and on behalf of all other Hispanic faculty ("Class Members") file this First Amended Complaint and class action against Defendant University of Texas at Austin ("UT") for violating Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq. ("Title VII") by engaging in unlawful national origin/Hispanic discriminatory employment practices to include disparate treatment and disparate impact claims of discrimination and claims of retaliation.

2.      Plaintiffs also seek relief for actions of Defendant Jay Hartzell ("Hartzell"), in his official and individual capacity, acting under color of state law, in violation of Plaintiffs' and the Class Members' civil rights, privileges, and immunities secured by the Civil Rights Act of 1871, the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. §1981 and laws of the State of Texas resulting in injuries to Plaintiffs and Class Members with the action brought through 42 U.S.C §1983.

3.      Martinez, who is Hispanic of Puerto Rican origin, has been employed by UT in Austin, Texas, during the relevant periods of time as set out in the allegations in this Complaint through to

the present. UT and Hartzell treated Martinez differently than non-Hispanic employees, and employees that did not engage in protected activities, including in pay, promotions, and appointments to compensated positions of leadership, in violation of the above listed statutes and Constitutional provisions.

4.   Zamora, who is Hispanic of Mexican origin, has been employed by UT in Austin, Texas, during the relevant periods of time as set out in the allegations in this Complaint through to the present. UT and Hartzell treated Zamora differently than non-Hispanic employees, and employees that did not engage in protected activities, including in pay, promotions, and appointments to compensated positions of leadership, in violation of the above listed statutes and Constitutional provisions.

5.   In addition to their individual claims, Plaintiffs seek to represent a class of Hispanic faculty (full, Associate, and Assistant Professors) University-wide, or in the alternative, a class of solely Hispanic full Professors University-wide who have been adversely denied equal pay, promotions, and appointments to compensated positions of leadership compared with similarly situated non-Hispanic faculty members, during the actionable period in this case.

6.   UT's and Hartzell's national origin/Hispanic disparate treatment of Plaintiffs and Class Members include knowing and intentional actions resulting in disparate and lower pay, denial of pay raises, and denial of appointment to compensated positions of leadership, in favor of less qualified, less experienced, and/or lower performing non-Hispanic faculty, which resulted in UT and Hartzell violating Plaintiffs' and Class Members' rights as protected by the statutes listed above.

7.   UT's and Hartzell's national origin/Hispanic disparate impact treatment of Plaintiffs and Class Members include disparate and lower pay, denial of pay raises, denial of appointment to compensated positions of leadership, and promotion of less qualified, less experienced, and/or lower performing non-Hispanic faculty.

8.   UT's and Hartzell's intentional discrimination and/or disparate impact discrimination includes failure or refusal to prevent, eliminate, or rectify discrimination against, and thereby protect, Hispanic faculty from national origin discrimination and retaliation.

9.   Accordingly, Plaintiffs and Class Members seek recovery from UT and Hartzell of all available damages in law and equity, caused by UT and Hartzell's illegal actions, including lost compensation, benefits, appointments, and promotions, or the equitable compensation equivalents during the entire actionable period in the past and also through to a reasonable period of time into the future as this Court determines justice and equity so require.

## JURISDICTION and VENUE

10. This Court has jurisdiction over this matter pursuant to 28 U. S. C. §1331 (Federal Question) and 28 U. S. C. §1343 (Civil Rights) for the claims brought under the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 2000e-5(f)(3).

11. Declaratory relief is authorized pursuant to 28 U. S. C. §§2201 and 2202 and Federal Rule of Civil Procedure Rule 57.

12. Venue is proper in this Court because UT is located within this District, Hartzell works within this District, UT conducts business in this District, most of the discriminatory employment practices hereafter alleged to be unlawful were committed within the jurisdiction of this District, and Plaintiffs reside and work within this District, therefore, venue is proper in this Court, 28 U.S.C. §1391(b) and (c).

13. Martinez has met/exhausted all required conditions precedents prior to the filing of this suit. Martinez filed a complaint/charge of discrimination alleging national origin discrimination and retaliation against UT with the U.S. Department of Labor ("DOL"), which enforces Title VII for federal contractors, on or about October 14, 2020, within 300 days of UT's illegal actions. As part of the agreements between the federal government and the State of Texas,

Martinez's complaint/charge was dual filed with the Texas Workforce Commission. Martinez received his right to sue letter no earlier than September 29, 2023 and therefore Martinez's complaint is timely filed (i.e., 90 days following the receipt of the right to sue letter). See Exhibits A and B which contain copies of Martinez's charge and right to sue letter referenced above.

14.   Zamora has met/exhausted all required conditions precedents prior to the filing of this suit. Zamora filed a complaint/charge of discrimination alleging national origin discrimination and retaliation against UT with the U.S. Department of Labor ("DOL"), which enforces Title VII for federal contractors, on or about January 7, 2021, withing 300 days of UT's illegal actions. As part of the agreements between the federal government and the State of Texas, Zamora's complaint/charge was dual filed with the Texas Workforce Commission. Zamora received his right to sue letter no earlier than September 29, 2023 and therefore Zamora's complaint is timely filed (i.e., 90 days following the receipt of the right to sue letter). See Exhibits A and B which contain copies of Zamora's charge and right to sue letter referenced above.

## JURY DEMAND

15.   Plaintiffs request a jury trial on all issues so triable.

## PARTIES

16.   Martinez is a citizen of the United States and the State of Texas and resides in Travis County, Texas.

17.   Zamora is a citizen of the United States and the State of Texas and resides in Travis County, Texas.

18.   UT is a state agency and may be served through its attorney of record in this case.

19.   Hartzell is employed by UT and may be served through his attorney of record in this case.

## **FACTUAL ALLEGATIONS**

20.   UT hired Martinez in 2005 as a lecturer in the History Department. Martinez's primary scholarly area has been in the history of physics (especially Einstein's special theory of relativity), history of mathematics, historical myths in science, Giordano Bruno and Galileo.

21.   UT is aware that during Martinez's employment at UT, Martinez has published seven scholarly books, including with top presses such as Princeton and Johns Hopkins.

22.   The publication of books is the most important scholarly requirement for promotions in the academic field of History.

23.   Martinez's publications have received highly positive reviews in academic journals and periodicals in countries such as the United States, Great Britain, Germany, Spain, Italy, China, and Malaysia.

24.   Two of his books have also been translated into Japanese and Turkish. Martinez has also published numerous articles in prestigious journals and periodicals.

25.   UT is aware that Martinez has been a Research Fellow at prominent institutions, including M.I.T., Harvard University, the California Institute of Technology, Boston University, and the Smithsonian.

26.   UT is also aware that during Martinez' employment, Martinez has taught 64 courses – a large amount and significantly more than most others who have taught in the history department during the same time period.

27.   UT promoted Martinez to full professor in 2015.

28.   Martinez is Hispanic (of Puerto Rican descent).

29.   UT hired Zamora in 2000. Zamora is a full Professor in the History Department who writes and teaches on the history of Mexicans in the United States, Texas history and oral history, and focuses on the working class and transnational experiences of Mexicans in Texas during the

twentieth century.

30.   UT is aware that Zamora has prepared or collaborated in the production of three single-authored books, a translated and edited WWI diary, a translated and edited two-volume work by Alonso S. Perales, three co-edited anthologies, a co-edited eBook, and three Texas history texts.

31.   UT is aware that Zamora has received seven book awards, a best-article prize, and a Fulbright García-Robles fellowship with a one-year residency at the University of Guanajuato, Mexico.  His awards include the 2017 Scholar of the year from the National Association for Chicana and Chicano Studies (NACCS), the 2017 NACCS Tejas Foco Premio Estrella de Aztlán Lifetime Achievement Award, the 2019 Ruth A. Allen Pioneer in Texas Working Class History Award from the Texas Center for Working-Class Studies, Collin College, the 2021 Roy Rosenzweig Distinguished Service Award from the Organization of American Historians, and the 2023 William C. Powers Jr. Lifetime Service Award from the University of Texas at Austin.

32.   UT is aware that Zamora is a lifetime member of the Texas Institute of Letters, a lifetime Fellow with the Texas State Historical Association (TSHA), and a past-President of TSHA in 2019-20, including membership in the organization's Executive Committee.

33.   Zamora is Hispanic (of Mexican descent).

34.   Both Martinez and Zamora began having informal conversations among themselves and with other Hispanic faculty in or about 2017 and 2018 regarding their shared sense that UT was paying them at a lower rate than fellow non-Hispanic faculty with comparable lengths of service, records of scholarship, teaching, and service.

35.   UT has used specific, facially neutral policies and practices for determining compensation, raises, promotions and appointments for its faculty.

36.   UT's policies and practices relating to faculty compensation, promotions, and appointments include, but are not limited to, Regents Rules and Regulations Rule 30501 "Employee

Evaluations" and Rule 31102 "Evaluation of Tenured Faculty."

37. Regents Rule 31102 specifically emphasizes the important role of top-ranking university officials, including deans and the university president, in the faculty evaluation process.

38. The rule specifically provides that "[r]esults of faculty evaluations will be communicated in writing to the … *dean, the chief academic officer, and the university president for review and appropriate action*." (Emphasis added.) Additionally, the rule provides that "[t]he evaluation *may* be used to determine salary recommendations, nomination for awards, or other forms of performance recognition." (Emphasis added.)

39. An implication contained within Regents Rule 31102 includes that salary raise decisions may be made irrespective of the employee's achievements or evaluations.

40. The Regents Rules also include a "model policy" for faculty reviews.

41. UT also has specific, facially neutral rules relating to faculty performance reviews and setting of salaries and promotion in its "Handbook of Operating Procedures."

42. Rule 2-2160 provides that the UT president, Chancellor of the UT System and Board of Regents are responsible for reviewing, approving, and confirming all salary rates and promotion decisions and that the "president may accept, reject, or modify all recommendations forwarded and may make decisions with regard to salary increases . . ."

43. An important component of compensation for some full professors at UT comes from "endowments." Endowments typically include specially set aside funds donated to the university.

44. UT appoints certain full professors with endowments and an honorific title such as an "Endowed Chair" or "Professorship."

45. Endowments are frequently used by UT to supplement a faculty members' salary, but UT does not report or include endowments as "salary" in public records.

46. UT does not publicly disclose the complete amounts of financial resources paid to

individual professors (i.e., UT does not publish complete faculty payments on any website, database, or publication that are available to the faculty as a whole or the general public).

47. Regents Rule 60202 provides that each university "president is responsible for maintaining oversight of Endowments established to support faculty positions, including assignment of holders and use of distributions, but may delegate this authority."

48. HOP 2-2440 provides that UT's president has delegated oversight authority to the "Executive Vice President and Provost," the second highest ranking position at UT just below the President.

49. While HOP 2-2440 provides that selection criteria for endowed chairs and professorships shall generally be based on a "record of excellence" there are no specific requirements or guidelines.

50. Additionally HOP 2-2440 provides that nomination and appointment procedures shall be clearly stated and should solicit input from faculty and academic leadership, again there are no specific requirements or guidelines.

51. In reality, UT frequently appoints faculty to endowed Chairs and Professorships with little or no transparency about criteria, process, and with no written deliberations about why any particular candidate was selected or, for that matter, passed over.

52. Under UT's policies and practices, in addition to the president and executive vice president/provost, the university's deans are also an important part of the salary, promotion, and appointments process. UT's deans report directly to the executive vice president/provost and are at the highest level of reporting and responsibilities. UT publishes an organization chart that shows their high place in the university administration:



53.   While UT's rules purport to establish objective means and measures to evaluate faculty for salaries, promotions, and appointments, such as for endowments and professorships, in fact, there are no binding requirements that these decisions be made on merit and instead, they allow for and result in manipulation of the rules, subjective decisions, and discriminatory bias in these decisions.

54.   Further, these policies and practices allow weight to be placed on various factors that are suspect for the unremediated potential (and demonstrated likelihood, as in the case of female and African American faculty) for these subjective factors to lead to, if not result in, discriminatory actions, including but not limited to compensation, appointment, and promotion decisions with little or no transparency, accountability, or basis on actual performance.

55.   UT also condones additional factors that are also suspect for their likelihood of leading

to illegal discriminatory decisions and actions include basing compensation, promotions, and appointments on decisions made "in secret," without being posted and without the opportunity for others to compete or interview for such promotions or appointments.

56. UT has no documentation showing how or what selection criteria were applied nor what weights were placed on committee or peer evaluations also made with little or no basis in actual or objective performance measures.

57. On May 2, 2018, Martinez, Zamora, and another Hispanic professors went before the History Department's faculty and supervisor with their concerns that Hispanic faculty were being paid less and received fewer promotions and appointments than non-Hispanic faculty and to request rectification of the disparities in compensation and lack of promotion to positions of leadership.

58. In response, the History Department created an Equity Committee which started that same day, on or about May 2, 2018. Both Martinez and Zamora were members of this Committee together with five other History Department faculty members.

59. After reviewing relevant employment and salary information, the Equity Committee found significant disparities against Hispanic Professors in the History Department. Martinez and Zamora, as part of the Equity Committee, presented a draft report to the department on or about October 15, 2018, which highlighted and opposed the fact that Hispanic faculty as well as other minority faculty were being paid lower salaries than other White faculty within the department that had a less-accomplished publication record.

60. In response to the History Department's Equity Committee draft report, some faculty reacted positively, while others, including the History Department's Chair, Jacqueline Jones, reacted negatively and defensively rejecting the reported information and responding as if the Committee was attacking her and her leadership. In an email to Martinez and other members of the committee, Department Chair Jones strongly objected to comparing faculty members' publication records to

their salaries and accused the committee of making "misleading statements or claims." Another senior non-Hispanic tenured faculty member in the department, Julie Hardwick, wrote that "The report is offensive[.] . . . I am happy to send you my cv (although this also is easily available on my faculty page) and a time sheet so you can see I'm not underproducing and overcompensated for service."

61. To the contrary, the report had not claimed that anyone was underproducing or overpaid, but that multiple individuals were underpaid considering their demonstrated production at greater levels than the higher paid non-Hispanic faculty members.

62. Both Martinez and Zamora also reached out to other Hispanic full Professors in other Departments and learned that they too were also experiencing compensation and other disparities compared to non-Hispanic full Professors.

63. This group of eight Hispanic full professors (Alberto Martínez, Jorge Cañizares-Esguerra, Emilio Zamora, Gloria González-López, Francisco Gonzalez-Lima, Martha Menchaca, Fred Valdez, John Morán González) met with Vice Provost Dr. Edmund Gordon in the summer of 2018 when he provided the Plaintiffs with charts that confirmed Hispanic pay disparities in the Liberal Arts College and throughout the university, contrary to the Hispanic faculty members' demonstrated objective achievements and merit.

64. Vice Provost Gordon then arranged for the group of Hispanic professors to meet with the Provost's Council for Racial and Ethnic Equity and Diversity ("CREED") on or about September 18, 2018, to present the disparities for Hispanics and particularly the compensation disparities.

65. CREED created seven subcommittees to ostensibly work on a Hispanic Faculty Initiative which delivered a report to the Provost at the end of that academic year, in May 2019.

66. Initially, CREED stated that it would analyze pay disparities, however it did not conduct such analysis, contrary to the Plaintiffs' request in September 2018.

67.   Both Martinez and Zamora gathered again with the six previously listed Hispanic full Professors in different Departments (Anthropology, English, Sociology, Psychology) in what they called the Independent Equity Committee. Plaintiffs and the Independent Equity Committee worked for months reviewing salary and performance information concerning Hispanic faculty and prepared the Hispanic Equity Report ("HER") completed on or about October 8, 2019. Plaintiffs and the Independent Equity Committee conveyed the HER to UT's top administrators, including the President, Provost, and Deans.

68.   The HER communicated to the President, Provost, and Deans the ongoing disparities that "constitute bias and discrimination against Hispanic employees." For example, the HER showed that in 2016-17, each of the 47 fulltime Hispanic full Professors at the University of Texas were paid a mean annual compensation of $25,342 less than the 758 White fulltime full Professors (over 13% deficit).

69.   The HER also found pay deficits averaging $10,647 and $18,930 for Hispanic Associate and Assistant Professors, respectively, across UT.

70.   The HER documented patterns of marginalization and discrimination against Hispanics and the disparities in compensated positions of leadership.

71.   For example, for 79 consecutive years, UT's Institute of Latin American Studies was only headed by White directors, never by Hispanics or Latin Americans.

72.   UT had never appointed a Hispanic person to a compensated position of leadership in the History Department.

73.   In 2019, UT had appointed or promoted 130 persons to university positions of Dean, Vice Dean, Associate Dean, and Assistant Dean, that is, all serving in 2019. Of those, UT had appointed or promoted only 10 Hispanics into those positions, that is only 7.7 % and none were awarded to Hispanic females, in contrast to the fact that nearly 20% of the Texas population were

Hispanic females and many of the Hispanic female faculty members within the university were eminently qualified.

74.  Of the approximately 250 administrators in the leadership of the university's schools, including the offices of the President, Provost, and Directors, but excluding Dept. Chairs, UT had appointed or promoted only 14 Hispanics by 2019.

75.  That amounted to only 6 %, and these were mostly in the lower positions.

76.  No Hispanics were Directors of major independent entities, such as the Blanton Museum, Ransom Center, Briscoe Center for American History, Institute of Latin American Studies, Clements Center of National Security, and Center for Sports Leadership.

77.  In 2018, UT had appointed or promoted 539 faculty members with endowed Chairs and Professorships. Of those 539, only 18 were Hispanic, which was only 3.3 % of the total.

78.   In contrast, nearly 40% of the population in Texas was Hispanic at that time.

79.  Subsequently, UT provided data charts to Texas State Representative from Travis County (where UT is geographically located), Gina Hinojosa. UT's own review of the data, controlling for field and experience, revealed that Hispanic full Professors had consistently received lower salaries than White full Professors for nine consecutive years (2009-2018) with an annual average of 12% lower per year:



80.  More than a decade earlier, UT had completed a Gender Equity Report that recognized a substantial and unacceptable pay deficit, of approximately $9,028 among female full Professors compared with male full Professors. In response, UT's central administration provided raises to the female faculty to rectify this identified and highlighted disparity.

81.  Additionally, Vice Provost Edmund Gordon informed Plaintiffs that UT had also worked to rectify pay disparities affecting Black faculty members after UT had addressed the female faculty disparities.

82.  While speaking at a Faculty Council meeting on or about November 11, 2019, UT's President at that time, Gregory Fenves, acknowledged that disparities affecting Hispanics existed and recognized the need to address such disparities, just as UT had done for female professors and Black professors.[1]

83.  Subsequently, Provost Maurie McInnis and President Fenves publicly acknowledged in

---

[1] President G. Fenves, Transcript of the Faculty Council Meeting, November 11, 2019.

writing and verbally on multiple occasions that the Hispanic pay disparity existed and that this was unfortunate and regrettable.

84.   Consequently, in the Spring of 2020, UT Provost McInnis allocated $3 million for "Equity Raises."

85.   Given the most recent reports and work by Plaintiffs and others identifying the pay disparities among Hispanic faculty, and an absence of any other identified disparities against protected classes of faculty, Plaintiffs were expecting that the Hispanic faculty pay disparities would be rectified mostly or fully by the Provost's Equity Raise initiative given that it was announced after the HER was produced and discussed by the Committee and UT's Administrators, including UT President Fenves and Provost McInnis.

86.   However, after the announcement of the Provost's Equity Raise initiative, both President Fenves and Provost McInnis left UT for positions at other universities before the planned recurring salary funds were allocated.

87.   In or about July, 2020, after Defendant Hartzell had been appointed UT Interim President, UT Senior Vice Provost Susan N. Beretvas noted that only $1.7 million of the funds were allocated for pay raises.

88.   The majority of those pay raises (82% of the $1.7 million) did not go to Hispanic faculty members, contrary to the disparate compensation deficits that HER and other analyses had demonstrated to her office.

89.   In summer 2020, while working on the Executive Committee of UT's Faculty Council, Martinez was the principal author of a committee report submitted to President Hartzell on July 27, 2020.

90.   The report requested funding for UT's academic programs in American ethnic studies, because of recent cutbacks. In 2018, UT's central administration and its College of Liberal Arts had

cut $1,552,195 from academic programs working on Hispanic, Black, Native American, and Asian American topics.

91.  Most of those cuts, 87.5%, were from those units focused on Hispanic topics, that is, $1,358,809 of the $1,552,195 total cuts at that time.

92.  President Hartzell chose not to restore the funding to such programs.

93.  Plaintiffs both engaged in the protected activities of investigating and opposing the pay disparities of Hispanic faculty across the University on uncompensated committees from in or about 2018 to 2020. These committees communicated directly with multiple UT administrators, including a written request for equity raises to President Hartzell and interim Provost Daniel Jaffe on or about August 3, 2020.

94.  President Hartzell did not respond to the committee's formal communication on pay discrimination sent to Hartzell and to Interim Provost Daniel Jaffe on or about August 3, 2020.

95.  Because of Defendants' failure to respond or to address the disparity issues raised regarding Hispanic faculty, Martinez filed a complaint of discrimination with the DOL, on or about October 14, 2020.  As part of the complaint process, the DOL sent a formal letter to UT advising it "to attempt to resolve the complaint if it wishes to do so," and instructing UT to not retaliate against Martinez.

96.   In or about November 2020, approximately thirteen weeks after Plaintiffs and the Independent Equity Review Committee of six other Hispanic full professors notified Hartzell and interim Provost Jaffe of discrimination towards Hispanic faculty, Jaffe created a committee called the Equity Review Process Consultative Committee ("ERPCC") in November 2020. The ERPCC's purpose was to assess salary equity among professors and to work with an outside contractor, hired by Hartzell, that would analyze salary inequities. The ERPCC would advise on how to use the remaining equity funds allocated by former Provost McInnis. The communications by Jaffe

concerning the ERPCC made no mention of the pay disparities affecting Hispanics.

97. Martinez was appointed to this uncompensated committee.

98. The ERPCC made a recommendation regarding which outside contractor to hire and that contractor was selected or approved by Hartzell as well.

99. Meanwhile, between the latter part of October 2020 and the early part of 2021, nine Hispanic professors, namely Zamora, Martinez, Fred Valdez, Martha Menchaca, Gloria González-López, Manuel Ramirez III, Francisco Gonzalez-Lima, Jorge Prozzi, and Nestor Rodriguez, filed complaints of discrimination with the DOL, which in turn sent formal letters to UT advising it to "to attempt to resolve the complaint if it wishes to do so," and instructing UT to not retaliate against persons who filed the discrimination complaints.

100. In or about February 2021, prior to the outside contractor performing any substantive work, and without any report being prepared by the contractor or the ERPCC, President Hartzell cancelled the contractor's work and disbanded the ERPCC.

101. Neither President Hartzell nor UT provided any reasons, explanations, data, or evidence that would justify their decision to abruptly abort the ERPCC's pending review of salaries, after the DOL's letters, or his refusal to rectify the Hispanic disparities.

102. In or about 2020, UT's Hispanic Faculty and Staff Association (HFSA), created a committee to analyze the salaries of staff.

103. In their formal report, completed on or about November 1, 2021, the HFSA found that in many UT staff jobs Hispanic employees too were paid less than non-Hispanic White employees at UT Austin, even when statistically controlling for sex, date of hire, and job codes.

104. The report referred to this Hispanic Pay Gap as "discrimination," and wrote: "Furthermore, these are [statistically] significant at a level of $P = 0.001$, which means there is less than one in a thousand chance of these patterns appearing by chance."

105.     The HFSA committee found that Hispanic staff in twenty staff job categories with the largest numbers of workers (representing 2,936 workers or 29.3% of all staff) were underpaid.

106.     The Report explained: "This report lays out how, by intention or traditional practice, the university currently operates in a manner that leads to a discriminatory effect on Hispanic staff."

107.     Federal laws, including Title VII of the Civil Rights Act and Equal Employment Law, obligate institutions receiving federal funding to identify and remedy policies and practices that have a discriminatory effect.

108.     The HFSA noted, "As members of the university community and as citizens of an increasingly diverse Texas, we urge attention to remedy this situation with all deliberate speed."[2]

109.     The HFSA presented their findings to President Hartzell, yet President Hartzell again did not rectify the problem. Instead, it appears that UT and President Hartzell have been consistently disregarding the Hispanic disparities.

110.     Approximately six months after the HFSA report, in or about April 2022, President Hartzell wrote an email to university employees which included numerous statements about employees' raises planned for Fall 2022 such as: "...a historically large investment in our people that we will make during the coming fiscal year and beyond.  ... resources to help address some of our most acute challenges through structural adjustments for some of our faculty and staff, ...  structural salary increases targeted for areas where we face the most labor pressure, will be the largest centrally funded pool in recent history.  ... an annual recurring investment in our people of approximately $50 million." However, Hartzell made no mention of Hispanic employees or the pay disparities affecting them.

111.     Following his April 2022 email, Hartzell made no public announcement as to whether

---

[2] Plaintiffs strongly support efforts to correct discrimination against Hispanic staff but cannot and do not include any causes of action in this complaint seeking recovery on behalf of staff members.

the $50 million investment, or any portion thereof, had in fact been fully distributed among faculty and staff salaries, or whether such funds had been used to resolve the pay disparities of Hispanic employees.

112.   After Martinez and Zamora opposed Hispanic discrimination, UT increased both of their salaries, but not enough to eliminate the disparities with comparable non-Hispanic Professors.

113.   Instead, despite having been informed multiple times of the disparities disproportionately impacting Hispanic faculty, UT chose to continue to pay both Plaintiffs and the other Hispanic faculty significantly less than other similarly situated professors who are not Hispanic.

114.   For example, during the actionable period in this lawsuit as well as for years before, UT has paid Martinez significantly less than comparable, similarly situated non-Hispanic fellow History Department full Professors under the same decision-makers. Examples include UT paying a higher salary to at least three specific, identified peers, even though Martinez has more publications/a better publication record, taught more courses at UT, and has more time in rank as a full Professor.

115.   Additionally, even though UT claimed to be conducting a review and making salary adjustments and raises from a $3 million "Equity Fund" as stated by Provost McInnis, UT did not provide Martinez with an "Equity" raise from that fund.

116.   Similarly, UT has paid Zamora significantly less than comparable, similarly situated fellow History Department full Professors under the same decision-makers during the actionable period in this lawsuit as well as for years before. These include three specific, identified peers, even though Zamora has more publications/a better publication record, taught more courses at UT, and has more time in rank as a full Professor.

117.   To the extent that UT claims that certain faculty were paid more than Plaintiffs

because of their former service as Department Chair or other former administrative positions, UT's actions violate Texas Education Code section 51.948(c), which provides that "[a]n institution of higher education may not pay a salary to a person who is reassigned from an administrative position to a faculty or other position at the institution that exceeds the salary of other persons with similar qualifications performing similar duties."

118. Plaintiffs Martinez and Zamora have consistently performed at or above the median performance levels of the objective criteria of publications, teaching, and service in their department during their time in rank as full Professors at UT, yet UT paid them less than other comparable, similarly situated full Professors under the same decision-makers.

119. Moreover, UT only appointed White non-Hispanic faculty to be Chair of the annual Salary Committee in the History Department, every year, for twenty consecutive years, until the present.

120. In spite of UT officials, including Hartzell, conducting university-wide reviews and studies of compensation for faculty, including Hispanic faculty, and making alleged university-wide compensation decisions, adjustments and raises, including through its Provost's Equity fund and its "historically large investment" in faculty and for "structural adjustments" and "structural salary increases," UT and Hartzell's actions have continued UT's discriminatory compensation towards Plaintiffs and other Hispanic faculty members, and failed to address or prevent their continuation in the future.

121. Despite learning that Hispanic faculty have experienced an even greater pay disparity than female and Black faculty, UT has still failed or refused to take action to fix the established practices, policies and actions that have resulted in verifiable discriminatory pay disparities against Hispanic individuals in contradistinction with simply haphazard or random pay disparities.

122. Additionally, after UT was notified of and acknowledged the pay disparities among

faculty groups who have been historically disadvantaged and discriminated against, such as female, Black and Hispanic faculty, UT has continued its policies, practices and compensation actions which discriminate against Hispanics.

123. UT has not provided any analysis or data to the Plaintiffs or to any of the Committees that were reporting disparate actions negatively impacting Hispanic faculty to refute the reported disparities affecting Hispanic faculty or to otherwise show that the Hispanic disparities were not or are not as bad as those disparities experienced by the female and Black faculty that UT rightly remediated.

**Discrimination and/or Retaliation In Appointments to Leadership Positions**

124. Until 2018-19, UT appointed people to serve in leadership positions in the History Department including Chair, Associate Chair, Graduate Advisor, Director of the Institute for Historical Studies, Director of Assessment, Editor of Not Even Past, without a formal application process.

125. UT had only ever selected White faculty to fill these positions.

126. In 2019, a new procedure was created to enable all faculty to at least apply for these positions, even though, UT continued not to select the Hispanic applicants.

127. Following the creation of the new procedure, six minority faculty members, and no White faculty members, expressed in writing to UT Administrators their interest in being considered for appointment to these six positions. Martinez and other Hispanic faculty were among these six.

128. Despite this interest from non-White faculty, UT continued not appointing any Hispanic faculty until, in 2021, the UT History Department selected Professor Jorge Cañizares Esguerra, a member of the Hispanic Equity Committee over a recently hired junior professor using an unprecedented process when prior appointments of non-Hispanic faculty for many years had been executed without a formal or documented process open to application and verification that the

selections were based upon objective and legitimate non-discriminatory and non-retaliatory criteria.

129. On March 11, 2020, Martinez applied for the position of Chair of the History Department.

130. The Search Committee did not follow its established application, interview, evaluation, recommendation, and selection processes to fill the Chair of the History Department at this time in early 2020.

131. That is, for the most part, the History Department had Martinez and the other applicants for the Chair position follow its established procedures for applying for the Chair position, but took an unprecedented action, in or about April, 2020, by naming Professor Daina Berry (non-Hispanic) as the History Department Chair.

132. Berry had not applied for the position.

133. Unlike Martinez and the other applicants, Berry had not gone through the application, interview, evaluation, recommendation, and selection processes as an applicant.

134. Instead, Berry was the Chair of the Search Committee for the History Department Chair position; so Berry was one of the persons assessing the applicants, including Martinez, and not being assessed, herself.

135. On information and belief, no Chair had ever been selected under the circumstances surrounding Berry's selection.

136. Martinez was more qualified for the History Department Chair position than Berry for multiple reasons, including that he had actually applied and went through the interview process for the position which Berry had not. Martinez also was more qualified for the chair position in that he had been employed longer at UT, had more years in rank as a full professor, taught more courses and had more publications and/or a better publication record using the metrics created and used annually by the History Department in evaluations for raises.

137. Similarly, another Hispanic applicant for the position, Professor Jorge Cañizares-Esguerra, also had more years worked at UT, more years in rank as a full professor, taught more courses, and had more publications and/or a better publication record using the metrics created and used annually by the History Department in evaluations for raises.

138. Similarly, as compared to Berry, Zamora also had more years worked at UT, more years in rank as a full professor, taught more courses, and had more publications and/or a better publication record using the metrics created and used annually by the History Department in evaluations for raises.

139. In or about May, 2020, UT appointed Madeline Hsu to the position of Associate Chair. Like with the appointment of Berry as Chair, UT did not follow any formal application processes or procedures in the selection of Hsu or give Martinez, Zamora, or others an opportunity to apply and compete for the position.

140. Moreover, Martinez and Zamora were more qualified for the Associate Chair position; they had a longer record of employment at UT, had more years in rank as full professors, had taught more courses and had more publications and/or a better publication record using metrics created and used annually by the History Department in evaluations for raises.

141. In or about June 2022, UT appointed Professor Alan Tully (non-Hispanic) as the new Interim Chair of the History Department, replacing Berry, even though there was no formal announcement of the job opening, no known interview process, and no opportunity for Martinez and Zamora to apply.

142. Some years back, Tully had previously served as Chair of the History Department for twelve years.

143. However, Martinez and Zamora were better qualified in other objective metrics, including that they had more publications/a better publication record, and taught more courses than

Tully.

144. Some months after appointing Tully, UT created a Search Committee to interview and evaluate applicants for the position of Department Chair.

145. UT appointed Martha Newman as the Chair of the Search Committee for a History Department Chair.

146. Martinez and others submitted their applications for the History Department Chair position.

147. However, on or about February 7, 2023, without interviewing or communicating with the applicants, like in the case of Professor Berry, UT selected Newman to serve as Interim Chair without explanation, without interviews, and despite the fact that Martinez and others had applied for the Chair position, while Newman had not applied, and Newman was the Search Committee Chair.

148. This the second time that UT appointed a non-Hispanic faculty member as the Interim Chair when that person had not applied for the position and denied Martinez and others their opportunity to compete for the position without any legitimate non-discriminatory or non-retaliatory reason.

149. The consecutive selections of Berry, Tully, Newman (all non-Hispanic), as Chair or Interim Chair of the History Department between April 2020 and February 2023, all demonstrate that Regents Policy UTS 187, a facially neutral policy, when applied by the History Department resulted in discriminatory outcomes each time of promoting non-Hispanics when the Hispanic candidates had applied and were more qualified for the position regardless of the absence of a legitimate non-discriminatory or non-retaliatory reason for failing to hire a person that had applied and gone through the established application, interview, evaluation, recommendation, and selection process.

150. Martinez and Zamora also allege, in the alternative, that UT used Regents Policy UTS 187, intentionally to justify the national origin discriminatory action or the retaliatory action of hiring non-Hispanic persons that had not engaged in protected activities instead of hiring the more qualified Hispanic candidates or more qualified candidates that had recently engaged in protected activities of reporting and speaking out against discriminatory practices against Hispanic faculty.

151. UT failed and/or refused to appoint or promote Martinez and Zamora to Chair or Associate Chair of the History Department because they are Hispanic or because they engaged in protected activities opposing discrimination in the workplace.

152. In addition to and as part of UT's compensation and promotion discrimination, for many years, UT repeatedly passed over and disregarded Zamora for endowed Professorships or an Endowed Chair in the History Department, contrary to his merits, while peers with fewer scholarly publications and achievements were granted such compensated honors. These include at least three of Zamora's peers, even though Zamora has more publications/a better publication record, taught more courses at UT, and has more time in rank as a full Professor than those three.

153. UT finally and belatedly recognized Zamora with an Endowed Chair position in 2022; but the disparities still persist.

154. On information and belief, Zamora's endowed chair pays less than endowments awarded by the same decision makers to at least some of his non-Hispanic peers, even though Zamora has more publications/a better publication record, taught more courses at UT, and has more time in rank as a full Professor.

155. UT and President Hartzell's discriminatory disparate treatment and facially neutral policies and practices that have created a discriminatory disparate impact on Martinez and Zamora have caused significant damages, including loss of pay/compensation, career advancement, retirement benefits, compensatory damages and other damages, both in the past and continuing into

the future.

156. Martinez and Zamora seek relief for their individual claims including: (a) a declaratory judgment that UT has engaged in systemic discrimination and that its policies, practices and actions have created a disparate impact against them and other Hispanic faculty by (i) paying them and other Hispanic faculty less than their non-Hispanic counterparts including in salary, professorships or endowments, (ii) failing to investigate or respond to evidence of discrimination in the workplace against them and Hispanic faculty, and (iii) otherwise subjecting Hispanic faculty to differential treatment; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief that effects a restructuring of UT's policies, practices and procedures for compensation and promotion decisions applicable to Hispanic faculty; (d) equitable relief that effects a restructuring of the UT compensation system so that Plaintiffs receive the compensation they would have been paid in the absence of UT's discrimination against them; (e) back pay, front pay, and other equitable remedies necessary to make plaintiffs whole from UT's past discrimination; (f) compensatory damages; (g) attorneys' fees, costs and expenses; and (h) other forms of relief available under the law.

157. Hartzell's discriminatory and disparate treatment of Hispanic faculty, including the ongoing failure to address, rectify, or prevent discrimination against Hispanic faculty, is intentional, willful, egregious, and deliberate. As a result, Hartzell is subject to an assessment of punitive damages appropriate to the economic and non-economic damages and harms suffered by the Plaintiffs, so as to prevent future illegal conduct.

## Discrimination Against Other Hispanic Faculty/Class Members

158. Plaintiffs reallege and incorporate the allegations contained in this complaint as if fully stated herein.

159. Plaintiffs are members of a class of all Hispanic tenured and tenure-track faculty

members who were affected by the actions of UT because of their protected status of Hispanic national origins and that have had a discriminatory disparate impact and/or were subject to discriminatory treatment in the actionable period in this case.  In the alternative, the class may consist of all tenured Hispanic full professors.

160. Plaintiffs reserve the right to amend the class definition based on discovery or legal developments and an amended or final definition of the class may be specified following discovery of class-based certification issues and by the class certification deadline.

161. The systemic discrimination described in this Complaint is continuing in nature.

162. The individual claims of the Plaintiffs, including as Class Representatives, require resolution of the common questions of whether UT's policies and practices regarding pay, promotions, and appointments to compensated positions of leadership had an illegal discriminatory impact and/or constitute illegal discriminatory treatment, including and/or whether UT had a systemic, broad-based policy of discrimination towards Hispanics such that it amounts to a pattern or practice.

163. Class Members, like Plaintiffs, met or exceeded the qualifications for their positions on the faculty in which they were employed prior to and during the actionable periods at issue in this case.

164. Class Members, like Plaintiffs, have consistently over multiple decades as well as within the actionable period in this lawsuit been paid less by UT than comparable, similarly situated non-Hispanic faculty of the same rank (i.e., full Professor, Associate Professor, and Assistant Professor) and within the same Department who have lesser experience, lower rank, lesser qualifications, and lesser objective measures of performance than the Class Members, even when accounting for alleged non-discriminatory factors like pay compression.

165. Class Members, like Plaintiffs, have been eligible and qualified for promotions and

appointments to compensated positions of leadership, such as endowed chairs and professorships, but have been consistently denied those promotions and appointments while UT and Hartzell promoted or appointed comparable, similarly situated non-Hispanic faculty members with lesser experience, lesser qualifications, and lesser objective measures of performance than the Class Members.

166. UT has a history of discriminating against Hispanic faculty that includes, but is not limited to the following adverse actions:

- consistently disparate pay,
- denials of promotion,
- denials of appointments to compensated positions of leadership,
- failure to rectify disparities impacting Hispanic faculty,
- fewer promotions to endowed positions.

167. Class Members, like Plaintiffs, have personally experienced and witnessed discriminatory disparate treatment and disparate impact by UT against Hispanic faculty. UT and Hartzell have participated in these discriminatory actions, including in the setting and approval of salaries that have little or no relation to the Hispanic faculty members' actual performance and denials of promotion, appointments, and endowments and the selection of less qualified non-Hispanic faculty for such promotions, appointments and endowments.

168. Additionally, after being presented with strong evidence of discrimination against Hispanic faculty, UT and Hartzell continued to take discriminatory actions including perpetuating the arbitrary setting of salaries, promotions, and appointments. UT and Hartzell have affirmed and continued to implement discriminatory actions and practices against Hispanic faculty, and failed to take any action to eliminate, correct or rectify the discriminatory treatment of Hispanic faculty for a period of years both prior to and through the actionable period in this case to the present.

169. Specific evidence supporting the discriminatory impact and discriminatory treatment by UT and Hartzell towards Class Members and Hispanic faculty includes clear statistical evidence,

including consecutive multi-year evidence presented by UT itself, the HER, and by additional statistical evidence that will be presented in the course of this lawsuit. Additional evidence includes UT's own policies and practices, UT and Hartzell's specific knowledge of the discrimination towards Hispanics and their decisions to continue and retain this discrimination, and to not correct or rectify it, evidence such as Plaintiff's personal experience and the experiences of other faculty members, including those cited in the HER, as well as other evidence.

170. Statistical analysis derived from an examination of UT's pay and promotion data has shown and will show that the Class of tenured and tenure-track Hispanic faculty, like the Plaintiffs, were disproportionately affected and disparately impacted by UT's policies and practices regarding pay, promotions, and appointments to compensated positions of leadership.

171. Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

172. Certification of the proposed Class is the most reasonable and efficient means of presenting the evidence and arguments necessary to resolve such questions for the Class Representatives/Plaintiffs and the Class members.

173. UT's discriminatory actions have affected a class of individuals so numerous that joinder of all members is impracticable. All Hispanic faculty at UT during the relevant period amounts to approximately 192 or more. Considering only the class of Hispanic full Professors at UT amounts to approximately 71 or more full Professors.

174. The possibility of joinder is also undermined by the fear of retaliation and other consequences of filing or joining a lawsuit against UT and/or Hartzell. In a university environment such as at UT, the need for "collegiality" and fear of offending peers and university leadership is paramount, in part because pay and promotion decisions are made by administrators with input from

peers and peer committees. Class members also were witness to UT and Hartzell's sudden disbanding of work by the ERPCC and the chilling lack of a public response or effort to remedy the Hispanic discrimination raised by Plaintiffs and others. Class members are also aware of the retaliation towards Plaintiffs. Additionally, other Hispanic faculty have specifically stated to Plaintiffs that while they believe UT is discriminating against them and other Hispanic faculty, they are afraid to publicly come forward in a lawsuit against UT or Hartzell.

175. The questions of fact and law applicable to Plaintiffs individual claims are common to the Class Members they seek to represent.

176. Common questions of fact include, *inter alia*: (a) whether UT's policies, practices and actions relating to compensation and promotion have resulted in Hispanic faculty being paid less and not being promoted when compared with similarly situated non-Hispanic faculty; (b) whether UT's policies, practices and actions relating to compensation and promotion have resulted in a statistically significant disparate impact on or are evidence of disparate treatment towards Hispanic faculty (c) what actions UT has taken to investigate, respond to or correct known disparities affecting Hispanic faculty, (d) whether UT lacks meaningful or appropriate standards, metrics, or policies and procedures to evaluate and make non-discriminatory decisions affecting Hispanic faculty; (e) whether UT systematically, intentionally, or knowingly compensated Hispanic faculty less than similarly-situated non-Hispanic faculty, including in salary, professorships, and endowments; (f) whether UT systematically, intentionally, or knowingly failed to promote Hispanic faculty to positions of leadership, including endowed positions, in spite of being more qualified than similarly-situated non-Hispanic faculty, and (g) whether UT otherwise discriminates against Hispanic faculty in the terms and conditions of employment.

177. The common issues of law include, *inter alia*: (a) whether UT has engaged in unlawful, systemic Hispanic discrimination through its policies, practices, and procedures affecting

compensation, promotion and appointment to compensated positions of leadership; (b) whether UT's actions identified herein and that may be further identified through discovery, have had a discriminatory disparate impact on Hispanic faculty, (c) whether UT's actions identified herein and that may be further identified through discovery, constitute discriminatory disparate treatment of Hispanic faculty, (d) whether UT's failure to institute adequate policies, procedures, standards, or maintain oversight of those policies, practices, and procedures have had a discriminatory disparate impact on or constitute discriminatory disparate treatment of Hispanic faculty; (e) whether UT's continuation of discriminatory policies, practices and actions and failure to investigate, respond to, correct or rectify known disparities affecting Hispanic faculty after such disparities were made known has had a discriminatory disparate impact or is discriminatory disparate treatment; and (f) whether UT is liable for maintaining and allowing a pattern and practice of discrimination against Hispanic faculty.

178. The actions to which Plaintiffs as Class Representatives and the Class members were subjected were approved by and the responsibility of the same individuals in UT's leadership, including President Hartzell and the Executive Vice President and Provost.

179. The same employment policies, practices and procedures at issue apply universally to all Hispanic faculty university-wide. These employment policies, practices, and procedures are not unique or limited to any school, department or group; rather they apply to Hispanic faculty and thus, affect the Class Representative and Class members in the same ways regardless of the school or department in which they work.

180. Discrimination in compensation, promotion and appointment against Hispanic faculty occurs as a pattern and practice throughout UT.

181. Plaintiffs seek to remedy the adverse effects of discrimination in their own lives and careers, to eliminate the adverse effects of discrimination in the lives and careers of other Hispanic

faculty, and to prevent future discrimination against Hispanic faculty by UT.

182. UT and President Hartzell's discriminatory disparate treatment and facially neutral policies and practices that have created a discriminatory disparate impact on Plaintiffs/Class Representatives and Class Members have caused the same damages for all, including loss of pay/compensation, career advancement, retirement benefits, compensatory damages and other damages, both in the past and continuing into the future.

183. The Class Representatives/Plaintiffs seek the same relief for their individual claims and for the claims of the members of the proposed Class: (a) a declaratory judgment that UT has engaged in systemic discrimination and that its policies, practices and actions have created a disparate impact against Hispanic faculty by (i) paying Hispanic faculty less than their non-Hispanic counterparts including in salary, professorships or endowments, (ii) failing to investigate or respond to evidence of discrimination in the workplace against Hispanic faculty, and (iii) otherwise subjecting Hispanic faculty to differential treatment; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief that effects a restructuring of UT's policies, practices and procedures for compensation and promotion decisions applicable to Hispanic faculty; (d) equitable relief that effects a restructuring of the UT compensation system so that Hispanic faculty receive the compensation they would have been paid in the absence of UT's discrimination against Hispanics; (e) back pay, front pay, and other equitable remedies necessary to make Hispanic faculty whole from UT's past discrimination; (f) compensatory damages; (g) attorneys' fees, costs and expenses; and (i) other forms of relief available under the law.

184. Hartzell's discriminatory and disparate treatment conduct, including the ongoing failure to address, rectify, or prevent discrimination against Hispanic faculty, is intentional, willful, egregious, and deliberate. As a result, Hartzell is subject to an assessment of punitive damages appropriate to the economic and non-economic damages and harms suffered by the Plaintiffs, so as

to prevent future illegal conduct.

## CAUSES OF ACTION

## CLASS ACTION

### COUNT I.
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

185. Plaintiffs reallege and incorporate the allegations contained in this complaint as if fully stated herein.  This cause of action is in addition to or in the alternative to the other claims in this complaint.

186. This Count is brought on behalf of the Class Representatives and all members of the Class.

187. At all relevant times herein, the Class Representatives and Class Members have been employees and Defendant UT is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000e.

188. The Class Representatives and Class Members are members of a protected group based on their Hispanic national origins.

189. Defendant UT's policies, practices and actions have produced a discriminatory disparate impact on the Class Representatives and Class Members with respect to compensation and appointments and promotions to compensated positions, as well as other terms and conditions of employment in violation of Title VII.

190. Defendant UT's policies, practices and actions constitute discriminatory disparate treatment of the Class Representatives and Class Members with respect to compensation and appointments and promotions to compensated positions, as well as other terms and conditions of employment in violation of Title VII.

191. Defendant UT's violations of law have caused damages to the Class Representatives

and Class Members for which Defendant is liable under Title VII.

## COUNT II.

**VIOLATION OF 42 U.S.C. § 1983, 42 U.S.C. § 1981, AND
FOURTEENTH AMENDMENT EQUAL PROTECTION
BY JAY HARTZELL, in his official and individual capacities**

192. Plaintiffs reallege and incorporate the allegations contained in this complaint as if fully stated herein.  This cause of action is in addition to or in the alternative to the other claims in this complaint.

193. At all times alleged herein, Defendant Hartzell was acting under color of law in his official and/or individual capacity.

194. The Equal Protection clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1981 require that no U.S. citizen may be denied equal access to the rights, privileges, and immunities secured by the Constitution and its laws on the basis of their race/national origin nor discriminated against in any way based on race/national origin.

195. Hartzell intentionally deprived Class Representatives and Class Members of equal access to rights, privileges, and immunities, and otherwise discriminated against Class Representatives and Class Members based upon their race/national origin, by unlawfully denying Class Representatives and Class Members equal pay/compensation, promotions, appointments to compensated positions of leadership both in the past and continuing into the future.

196. Class Representatives and Class Members' Constitutional and statutory rights were clearly established at the time of Hartzell's misconduct because a reasonable person in Hartzell's position would understand that such acts would cause a deprivation of Plaintiffs' and Class Members' rights.

197. At all times material herein, Hartzell intentionally discriminated against Class Representatives and Class Members based on their national origin set forth herein, all in violation

of the Equal Protection provision of the 14th Amendment to the Constitution and 42 U.S.C. §1981 recoverable through this 42 U.S.C. §1983 action.

198. Hartzell's intentional and deliberate indifference to Class Representatives and Class Members' Civil Rights was the moving force behind the Class Representatives' and Class Members' deprivation of their Constitutional and statutory rights and quality of life and freedoms that are provided to other national origins outside of Class Representatives' and Class Members' protected class.

199. As a result of Hartzell's illegal actions against Class Representatives and Class Members, Plaintiffs and Class Members have suffered economic and non-economic damages as set herein.

200. As a result of the intentional, willful, egregious, and deliberate acts by Hartzell, Hartzell is liable for punitive damages to prevent future illegal conduct against Hispanic faculty.

<u>**INDIVIDUAL CLAIMS**</u>

<u>**COUNT III**</u>

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
DISPARATE IMPACT IN PAY, PROMOTIONS, AND APPOINTMENTS**

201. Plaintiffs reallege and incorporate the allegations contained in this complaint as if fully stated herein.  This cause of action is in addition to or in the alternative to the other claims in this complaint.

202. At all relevant times herein, the Plaintiffs have been employees and Defendant UT is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000e.

203. Plaintiffs are members of a protected group based on their Hispanic national origins.

204. UT maintained and implemented facially neutral policies and practices that resulted in Plaintiffs being disparately impacted with disparate and lower pay, promotions, and appointments

to compensated positions of authority during the actionable period when compared with similarly situated non-Hispanic faculty even though the Plaintiffs were more qualified and experienced than the similarly situated non-Hispanic faculty members.

205. UT's facially neutral policies and practices include its official policies that purport to direct that faculty compensation, promotions and appointments should be based on performance, but instead allow for the disregard of objective performance metrics in favor of subjective, biased, and discriminatory decision-making.

206. Additionally, UT's reviews of salaries and compensation and actions taken in response that purport to be facially neutral and even intended to address "equity" in employment decision, such as through distribution of its "Equity Fund" as well as its $50 million "historically large investment" in faculty and staff and for "structural adjustments" and "structural salary increases," have had and continue to have disproportionally negative impact on Plaintiffs and other Hispanic faculty. Additional facially neutral policies and practices include UT's admitted absence of a process, practice, database or failure to take other actions to monitor decisions regarding pay, promotions, and appointments to compensated positions of authority for their impact on Hispanic faculty as compared to similarly situated non-Hispanic faculty.

207. Additional facially neutral policies, practices, or actions that have a disparate impact may also be identified in the course of discovery for the expressed purpose of obtaining evidence of disparate impact and class certification claims.

208. UT's policies, practices and other actions described in this Complaint have been utilized by UT on an ongoing basis for many years, including prior to Plaintiffs filing charges with the DOL.

209. Statistical analyses derived from an examination of UT's pay data has shown and will show that UT's facially neutral policies, practices and other actions disproportionately and discriminatorily impacted Plaintiffs.

210. UT's facially neutral policies and practices have created a discriminatory disparate impact on Plaintiffs in violation of Title VII of the Civil Rights Act and has caused Plaintiffs to suffer damages as set out herein.

## **COUNT IV**

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
### DISPARATE TREATMENT: PAY, PROMOTIONS, AND APPOINTMENTS

211. Plaintiffs reallege and incorporate the allegations contained in this complaint as if fully stated herein.  This cause of action is in addition to or in the alternative to the other claims in this complaint.

212. At all relevant times herein, Plaintiffs have been employees of UT during the actionable period, covered by and within the meaning of § 701 of Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000e.

213. Plaintiffs are members of a protected group based on their Hispanic national origins.

214. UT's illegal actions include disparate treatment of paying Plaintiffs lower compensation and failing or refusing to promote or appoint Plaintiffs to compensated positions of leadership during the actionable period even though the Plaintiffs were more qualified and experienced than similarly situated non-Hispanic faculty members.

215. UT's illegal actions also include continuing and maintaining discriminatory pay, and failing and refusing to provide Plaintiffs with promotions and appointments to compensated positions of leadership even after such disparities, disparate impact and/or discriminatory actions affecting Hispanics were made known to UT.

216. UT's actions were knowing and intentional discriminatory actions against Plaintiffs due to their Hispanic/national origin protected class.

217. The discriminatory pay, promotions, and appointments to compensated positions of

authority described in this Complaint have been carried out by UT on an ongoing basis for many years and continued after Plaintiffs filed charges with the DOL.

218. As a result of UT's violations of Title VII, Plaintiffs have suffered and seek to recover economic and non-economic damages as set forth herein.

## COUNT V

## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT RETALIATION

219. Plaintiffs reallege and incorporate the allegations contained in this complaint as if fully stated herein.  This cause of action is in addition to or in the alternative to the other claims in this complaint.

220. At all relevant times herein, Plaintiffs have been employees of UT and covered by and within the meaning of § 701 of Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000e.

221. Plaintiffs engaged in protected activities, including opposing discrimination towards themselves as well as other Hispanic faculty internally and by filing charges of discrimination and retaliation with the appropriate administrative agency(ies).

222. Plaintiffs' protected activities were known by UT, Hartzell, and other decision makers involved in making employment decisions affecting Plaintiffs, including communications in writing via reports, data, and emails, and verbally in meetings with multiple UT administrators and Hartzell.

223. Following the Plaintiffs' protected activities of opposing discrimination in the workplace and in retaliation for those protected activities, UT retaliated against Plaintiffs because of the protected activities, including refusing and failing to promote or appoint Plaintiffs to compensated positions of leadership including but not limited to History Department Chair or Associate Chair.

224. UT's acts were knowing and intentional due to their protected activity.

225. As a result of UT's violations of Title VII, Plaintiffs have suffered and seek to recover economic and non-economic damages as set forth herein.

**COUNT VI**

**VIOLATION OF 42 U.S.C. § 1983, 42 U.S.C. § 1981, AND
FOURTEENTH AMENDMENT EQUAL PROTECTION
BY JAY HARTZELL, in his official and individual capacities
REGARDING PAY, PROMOTIONS, AND APPOINTMENTS**

226. Plaintiffs reallege and incorporate the allegations contained in this complaint as if fully stated herein.  This cause of action is in addition to or in the alternative to the other claims in this complaint.

227. At all times alleged herein, Defendant Hartzell was acting under color of law in his official and/or individual capacity.

228. The Equal Protection clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1981 require that no U.S. citizen may be denied equal access to the rights, privileges, and immunities secured by the Constitution and its laws on the basis of their race/national origin nor discriminated against in any way based on race/national origin.

229. Hartzell intentionally deprived Plaintiffs of equal access to rights, privileges, and immunities, and otherwise discriminated against Plaintiffs based upon their national origin, by unlawfully denying Plaintiffs equal pay/compensation, promotions, appointments to compensated positions of authority both in the past and continuing into the future as described herein.

230. Plaintiffs' Constitutional and statutory rights were clearly established at the time of Hartzell's misconduct because a reasonable person in Hartzell's position would understand that such disregard and adverse acts would preserve and cause a deprivation of Plaintiffs' rights.

231. At all times material herein, Hartzell intentionally discriminated against Plaintiffs based on their race/national origin set forth herein, all in violation of the Equal Protection provision of the

14th Amendment to the Constitution and 42 U.S.C. §1981 recoverable through this 42 U.S.C. §1983 action.

232. Hartzell intentionally discriminated against Plaintiffs by unlawfully and discriminatorily denying Plaintiffs equal pay/compensation, promotions, appointments to compensated positions of authority when compared to what similarly situated non-Hispanic faculty received.

233. Hartzell's intentional and deliberate indifference to Plaintiffs' civil rights was the moving force behind Plaintiffs' and deprivation of their Constitutional and statutory rights and quality of life and freedoms that are provided to other national origins outside of Plaintiffs' protected class.

234. As a result of Hartzell's illegal actions, Plaintiffs have suffered economic and non-economic damages as set out above.

235. As a result of the intentional, willful, egregious, and deliberate acts by Hartzell against Plaintiffs, Hartzell is liable for punitive damages to prevent future illegal conduct against Hispanic faculty.

## COUNT VII

### VIOLATION OF 42 U.S.C. § 1983, 42 U.S.C. § 1981, AND FOURTEENTH AMENDMENT EQUAL PROTECTION BY JAY HARTZELL, in his official and individual capacities REGARDING RETALIATION

236. Plaintiffs reallege and incorporate the allegations contained in this complaint as if fully stated herein.  This cause of action is in addition to or in the alternative to the other claims in this complaint.

237. At all times alleged herein, Defendant Hartzell was acting under color of law in his official and/or individual capacity.

238. The Equal Protection clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1981 require that no U.S. citizen may be denied equal access to the rights, privileges, and immunities secured by the Constitution and its laws on the basis of their race/national origin nor discriminated against in any way based on race/national origin or retaliated against for opposing such discrimination.

239. Plaintiffs engaged in protected activities, including opposing discrimination towards themselves as well as other Hispanic faculty internally and by filing charges of discrimination and retaliation with the DOL/EEOC.

240. Plaintiffs' protected activity was known by Hartzell, including communications in writing via reports and emails since 2019, and verbally in meetings with multiple UT administrators and Hartzell.

241. Following the Plaintiffs' protected activities of opposing discrimination in the workplace and in retaliation for those protected activities, Hartzell retaliated against Plaintiffs because of the protected activities, including refusing and failing to promote or appoint Plaintiffs to compensated positions of leadership including but not limited to History Department Chair or Associate Chair.

242. Hartzell's actions were knowing and intentional due to their protected activity.

243. As a result of Hartzell's illegal actions, Plaintiffs have suffered and seek to recover economic and non-economic damages as set forth herein.

## ATTORNEYS' FEES AND COSTS

244. Plaintiffs were forced to retain attorneys to pursue this action to seek remedy for UT's and Hartzell's illegal actions and therefore request all reasonable and necessary attorneys' fees and costs attendant to this litigation to include on appeal, as necessary.

**RELIEF SOUGHT**

**WHEREFORE**, Plaintiffs and Class Members pray for an order entering Judgment against UT and Hartzell, and awarding Plaintiffs and Class Members the following relief:

(a) a declaratory judgment that UT and/or Hartzell has engaged in systemic discrimination and its policies, practices and actions have constituted discriminatory disparate treatment and/or created a disparate impact against Hispanic faculty by (i) paying Hispanic faculty less than their non-Hispanic counterparts including in salary, professorships or endowments, (ii) failing to investigate or respond to evidence of discrimination in the workplace against Hispanic faculty, and (iii) otherwise subjecting Hispanic faculty to differential treatment;

(b) a permanent injunction against continuing discriminatory conduct against Plaintiffs, Class Members and/or other Hispanic faculty;

(c) a permanent injunction against retaliatory actions against Plaintiffs, Class Members and/or other Hispanic faculty;

(d) injunctive relief that effects a restructuring of UT's policies, practices and procedures for compensation and promotion decisions applicable to Plaintiffs, Class Members and/or Hispanic faculty;

(e) equitable relief that effects a restructuring of the UT compensation system so that Plaintiffs and Class Members receive the compensation they would have been paid in the absence of UT's discrimination against Hispanics;

(f) back pay, front pay, and other equitable remedies necessary to make Plaintiffs and Class Members whole from UT's past discrimination and/or retaliation;

(g) compensatory damages;

(h) attorneys' fees, costs and expenses;

(i) punitive damages against Hartzell; and

(j) all other relief that the Court deems justice and equity so require.

Respectfully submitted,

*/s/ Robert Notzon*
Robert Notzon
The Law Office of Robert Notzon
Texas Bar No. 00797934
1502 West Avenue
Austin, Texas 78701
Robert@NotzonLaw.com
(512) 474-7563
(512) 852-4788 facsimile

Robert W. Schmidt
Robert W. Schmidt Law Firm, PLLC
State Bar No. 17775429
bob@robertwschmidt.com
1502 West Avenue
Austin, Texas 78701
Telephone:  (512) 484-2276
Facsimile:  (512) 537-0708

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 8, 2024, this document was served pursuant to Federal Rules of Civil Procedure on counsel for Defendants through the Court's electronic filing system at the following address:

Todd Dickerson
Assistant Attorney General
Office of the Attorney General of Texas
General Litigation Division
P.O. Box 12548
Capitol Station,
Austin, Texas 78711-2548
Fax (512) 320-0667
Todd.Dickerson@oag.texas.gov

*By:  /s/  Robert Notzon*

# Ex. A

| | |
|---|---|
| **From:** | Alberto Martinez |
| **To:** | OFCCP-SW-CC4 - ESA; Rodriguez, Juan J - OPA; Rideaux, Chauntra D. - OPA |
| **Subject:** | Fwd: OFCCP Complaint Form |
| **Date:** | Thursday, October 15, 2020 12:13:04 AM |

To whom it may concern,

I received a phone call from Ms. Chanel Richards-Stelly of OFCCP requesting that I submit my complaint through the online portal. So, I tried to submit my complaint online, but despite countless efforts it was not possible because the system constantly stated that I had used special characters. In fact, I had not, since I even tried to submit my complaint after removing all punctuation signs, all numbers, all spaces, and even using programs online that remove all hidden or unusual text. So, finally I had to give up and submit the complaint as it appears below. (I tried to find Ms. Richards-Stelly's email online, but no luck.)

However, in any case, do please append the text which I here include, since the online system did not allow it in any format:

COMPLAINT:

1. What actions the employer took against you.
In 2017-18 I was a member of the Salary Committee of the Department where I work at the University of Texas. I found out about disparities in salaries, including my own. This led to the creation of an Equity Committee within the Department, on May 2, 2018. Subsequently, I communicated with other Hispanic employees (in my same job category and rank: full Professor), and we realized that they too were underpaid compared to their non-Hispanic peers. In summer 2018, we approached an administrator, Vice Provost Dr. Ted Gordon, and asked him to about salaries. He provided charts that confirmed what we had found. Consequently we met with the Provost's Council for Racial and Ethnic Equity and Diversity (CREED), on Sept. 18, 2018, to present problems affecting Hispanics, especially disparities in compensation. CREED therefore convened seven subcommittees to work on a "Hispanic Faculty Initiative." By May 2019, their Report was delivered to the Provost; however, we were disappointed that this report did not analyze compensation. Therefore, we painstakingly prepared the Hispanic Equity Report, completed on Oct. 8, 2019, which formally notified UT administrators about ongoing inequities that "constitute bias and discrimination against Hispanic employees." E.g., it shows that in FY 2016-17, the 47 full-time Hispanic full Professors at UT Austin were each paid a mean annual compensation of $25,342 less than the 758 White full professors who were full-time, a difference of -13 percent. This difference was evident in my own salary too. This disparity is worse than the grave disparity between the compensation of male and female faculty identified in UT's 2008 Gender Equity Report, that: "On average across the University in 2007, female [full] professors earned $9,028 less than men." (That disparity of -7% was subsequently remedied by means of central administration raises for female faculty.)

2. Why you believe those actions were based on your: race; color; religion; sex; sexual orientation; gender identity; national origin; disability; veteran status; and/or inquiries about, discussions, or disclosures of your pay or the pay of others; and/or in retaliation for filing a complaint, participating in discrimination proceedings, opposing unlawful discrimination, or exercising any other rights protected by OFCCP.
I know that these allocations of disparate pay are based on ethnicity (being Hispanic) and race (not being non-Hispanic White employees or others), because these disparities are:

(a) distinct to Hispanic full Professors, that is, Asian, White, Black employees are not affected by such a large, constant annual pay gap;

(b) consulting multiple Hispanic professors we found that we did not get promotions to positions of leadership, unlike our non-Hispanic colleagues;

(c) we analyzed salaries and resumes of 90 faculty in the College of Liberal Arts, including 13 Hispanic full professors in four large departments, constituting 27 percent of all Hispanic full Professors at UT Austin, and we found that most of them are paid near the bottom of the pay scales, even though 54 percent are in the Top 10 most published in their departments;

(d) an analysis of covariance with one-tailed hypothesis testing, adjusted for covariates of gender, years employed, and publications, showed that the mean compensation of Hispanic faculty was statistically significantly lower than the mean compensation of White faculty;

(e) the salary disparity remains even when we statistically controlled for departments, confirming that it is Not because

one is comparing apples to oranges (for example, White professors in engineering with Hispanic professors in Education);

(f) also, we found a near zero correlation between the compensation and quantity of publications of only Hispanic faculty, contrary to the strong correlations found for Asian, Black, and White faculty;

(h) the Editorial Boards of prominent state newspapers, the Austin American-Statesman, and the Houston Chronicle, have publicly called upon UT Austin to urgently fix this pay disparity. Yet UT administrators have not;

(g) most importantly, UT Austin provided IRRIS charts to Representative Gina Hinojosa, showing that in contrast to White full professors, Hispanic full professors have constantly had lower salaries for 9 consecutive years (2010-18), an average of 12 percent lower per year;

3. When the employer actions happened, where they happened, and who was involved.

The salaries of professors like myself are set by Department Chairs and Deans. Each October 1st, the new salaries become effective, in payroll. Yet the University has no structure in place to ensure than employees of a higher rank (for example, Professor) are paid more than employees of a lower rank (for example, Associate Professor, or Assistant Professor), therefore, when Chairs and Deans allocate raises and new employee salaries, they manifest carelessness, bias, or favoritism, by granting higher salaries to some employees. Throughout the years, the sum of such acts creates a cumulative effect of discrimination against Hispanic employees, above all, as evidenced in our lower pay, in nearly all departments of the university, and contrary to our productivity and rank.

4. What harm, if any, you or others suffered because of the alleged discrimination or retaliation.

During the last nine or ten years, I and other Hispanic full Professors have suffered the damage of annual disparate pay, in the amount of 12% less than our non-Hispanic White coworkers, plus loss of interests on such lost earnings. Also, social capital, respect, inclusion, and promotions to positions of leadership are granted more often to faculty with higher salaries, while those of us who are Hispanic and underpaid are granted fewer promotions to positions or leadership, awards, opportunities, etc. We quantified this in terms of our lack of endowment awards, teaching awards, and administrative roles.

5. What explanation, if any, your employer or people representing your employer offered for their actions.

In writings and in person, the past President Gregory Fenves and the Provost Maurie McInnis both acknowledged (Oct.18, Oct.30, Nov.11, 2019, Feb.18, Feb.21, 2020) that inequities in salaries do exist and that they affect Hispanic faculty. They spoke of it as something unfortunate and regrettable, but did not offer a clear explanation. McInnis did say that the university is "very decentralized" so that problems do arise and accumulate. And, she said that the university lacked centralized data systems to track such disparities. However, McInnis and Fenves both resigned in mid-2020. We wrote a formal letter to the new President and Provost on August 3, but received no reply.

6. Who was in the same or similar situation as you and how they were treated. Include information such as the race, color, religion, sex, sexual orientation, gender identity, national origin, disability, or protected status of these individuals, if known.

In 2008, our university recognized a grave disparity between the compensation of male and female faculty, which it identified in UT's 2008 Gender Equity Report, that: "On average across the University in 2007, female [full] professors earned $9,028 less than men." UT administrators rightly recognized that that pay gap was unacceptable, and set to fix it. That disparity of -7 percent was subsequently remedied by means of central administration raises for female faculty. Presently, the pay gap for Hispanic full Professors is far larger, namely -12% per year. We estimate that, 47 affected Hispanic full Professors (both men and women), as of 2017, plus multiple others in lower ranks, maybe around 10 or 20 Associate Professors. In the former group the differences are statistically very large (-12%). In the latter group, the differences affect more clearly certain individuals, not necessarily most of them. However, if one does not "control for departments" as was not done in the OFCCP intervention with Princeton University, then clearly Hispanic professors in all ranks are affected. Our Hispanic Equity Report found annual pay gap differences (compared to non-Hispanic White employees) of -$25,342 for Hispanic full Professors, -$10,647 for Hispanic Associate Professors, and -$18,930 for Hispanic Assistant Professors, at UT Austin.

7. What information you have about federal contracts the company that you worked for had at the time of the discrimination or retaliation you describe in this complaint.

Here are many federal contracts:

https://gov.data2www.com/vendor/USA/127688380

They include many contracts with the Department of Defense, but I'm sure there are contracts with other federal agencies too.

The rest of my submission is below.
Thank you,

Dr. Alberto A. Martinez
Professor, UT Austin

---------- Forwarded message ----------
From: **Department of Labor/OFCCP** <OFCCP_Complaints@dol.gov>
Date: Wed, Oct 14, 2020 at 11:56 PM
Subject: OFCCP Complaint Form
To: <almartinez1905@gmail.com>



# Complaint Involving Employment Discrimination by a Federal Contractor or Subcontractor

**Please read the instructions before completing this form.**

OMB: 1250-0002
Expires: 5/31/2023

Reset Form    Print Form    Submit

| **How can we reach you?** | Name (First, Middle, Last): _Alberto Antonio Martinez_<br>Street Address: _409 E 38th St, Apt 203_<br>City: _Austin_<br>State: _TX_  Zip Code: _78705_<br>Telephone Number: _5125172755_<br>Home<br>Work<br><br>Cell<br><br><br>E-mail: _almartinez1905@gmail.com_<br><br>**Have you filed these allegations of employment discrimination with another federal or local agency?**<br><br><br>Yes<br><br>No<br><br><br>If yes, provide the agency and date filed: _____<br>Contact Name: _____ Phone Number: _____ |
|---|---|
| **Who can we contact if we cannot reach you?** | Name (First, Middle, Last): _Emilio Zamora_<br>Street Address: _2653 Barton Hills Drive_<br>City: _Austin_<br>State: _TX_  Zip Code: _78704_<br>Telephone Number: _5127390168_<br>Home<br>Work |

|  | Cell |
|  | E-mail: e.zamora@austin.utexas.edu |

| **What is the name of the employer that you believe discriminated or retaliated against you?** | Company Name: The University of Texas at Austin<br>Street Address: 110 Inner Campus Drive<br>City: Austin<br>State: TX  Zip Code: 78705<br>Telephone Number: 5124713434<br><br>**Give the date(s) and times you believe you were discriminated against:**<br><br>Oct 1 2017 until the present |

| **Why do you believe your employer discriminated or retaliated against you?** | Race<br>American Indian or Alaska Native<br>Indicate Tribal Affiliation:<br>Asian<br>Black or African American<br>Native Hawaiian or Other Pacific Islander<br>White | National Origin<br>Hispanic or Latino<br>Other<br>Color<br>Religion<br>Sex | Sexual Orientation<br>Gender Identity<br>Inquiring About Pay<br>Discussing Pay<br>Disclosing Pay | Protected Veteran Status<br>Disability<br>Retaliation |

**How did you learn that you could file a complaint with OFCCP?**

**Internet**
**Poster**
**Community Organization**
**OFCCP Meeting/Event**
**Brochure**
**Other**

**Your Complaint:**

**Please describe below what you think the employer did or didn't do that you believe caused discrimination or retaliation, including:**

1. What actions the employer took against you.
2. Why you believe those actions were based on your: race; color; religion; sex; sexual orientation; gender identity; national origin; disability; veteran status; and/or inquiries about, discussions, or disclosures of your pay or the pay of others; and/or in retaliation for filing a complaint, participating in discrimination proceedings, opposing unlawful discrimination, or exercising any other rights protected by OFCCP.
3. When the employer actions happened, where they happened, and who was involved.
4. What harm, if any, you or others suffered because of the alleged discrimination or retaliation.
5. What explanation, if any, your employer or people representing your employer offered for their actions.
6. Who was in the same or similar situation as you and how they were treated. Include information such as the race, color, religion, sex, sexual orientation, gender identity, national origin, disability, or protected status of these individuals, if known.
7. What information you have about federal contracts the company that you worked for had at the time of the discrimination or retaliation you describe in this complaint.

After multiple efforts I have to acknowledge that the online system presently is not working Please contact me by email to receive the full text of the complaint which I have tried to submit multiple times yet constantly getting the notification that there are special characters even after I have removed all symbols numbers punctuation marks and even spaces I do apologize for the inconvenience

| **Do you think the discrimination includes or affects others?** | Do you believe other employees or applicants were treated the same way as you described above?<br><br>Yes<br>No |
|---|---|
| **Do you have an attorney or other representative?** | If you are represented by an attorney, or another person, or an organization, please provide their contact information below.<br><br>Name (First, Middle, Last): _____<br>Street Address: _____<br>City: _____<br>State: _____ Zip Code: _____<br>Telephone Number: _____<br>E-mail: _____<br>Who should we contact if we need more information about your description of what occurred?<br><br>You<br>Your Representative |
| **Signature and Verification** | I declare under penalty of perjury that the information given above is true and correct to the best of my knowledge or belief. A willful false statement is punishable by law.<br><br>I hereby authorize the release of any medical information needed for this investigation.<br><br>Signature of Complainant: _Alberto A. Martinez_____  Date: _10/14/2020_____ |

Form CC-4 (Revised 5/2020)



# Complaint Involving Employment Discrimination by a Federal Contractor or Subcontractor

Please read the instructions before completing this form.

OMB: 1250-0002
Expires: 5/31/2023

## How can we reach you?

Name (First, Middle, Last): Fred Valdez, Jr.

Street Address: 2424 Legend Trail

City: Leander

State: Texas

Zip Code: 78641

Telephone Number: 5123375076

☑ Home

☐ Work

☐ Cell

E-mail: fredv@austin.utexas.edu

Have you filed these allegations of employment discrimination with another federal or local agency?

☐ Yes

☑ No

If yes, provide the agency and date filed:

Contact Name:

Phone Number:

## Who can we contact if we cannot reach you?

Name (First, Middle, Last): Martha Menchaca

Street Address: 6302 Needham Lane

City: Austin

State: Texas

Zip Code: 78739

Telephone Number: 5122881952

☑ Home

☐ Work

☐ Cell

E-mail: mmen@austin.utexas.edu

# What is the name of the employer that you believe discriminated or retaliated against you?

Company Name: University of Texas at Austin

Street Address: 110 Inner Campus Dive

City: Austin

State: Texas

Zip Code: 78705

Telephone Number: 5124713434

Give the date(s) and times you believe you were discriminated against:

October 1, 2017 to present

# Why do you believe your employer discriminated or retaliated against you?

☐ **Race**

☐ American Indian or Alaska Native

Indicate Tribal Affiliation:

☐ Asian

☐ Black or African American

☐ Native Hawaiian or Other Pacific Islander

☐ White

☑ **National Origin**

☑ Hispanic or Latino

☐ Other

☐ **Color**

☐ **Religion**

☐ **Sex**

☐ **Sexual Orientation**

☐ **Gender Identity**

☐ **Inquiring About Pay**

☐ **Discussing Pay**

☐ **Disclosing Pay**

☐ **Protected Veteran Status**

☐ **Disability**

☐ **Retaliation**

## How did you learn that you could file a complaint with OFCCP?

☐ Internet

☐ Poster

☐ Community Organization

☐ OFCCP Meeting/Event

☐ Brochure

☑ Other

## Your Complaint:

**Please describe below what you think the employer did or didn't do that you believe caused discrimination or retaliation, including:**

1. What actions the employer took against you.
2. Why you believe those actions were based on your: race; color; religion; sex; sexual orientation; gender identity; national origin; disability; veteran status; and/or inquiries about, discussions, or disclosures of your pay or the pay of others; and/or in retaliation for filing a complaint, participating in discrimination proceedings, opposing unlawful discrimination, or exercising any other rights protected by OFCCP.
3. When the employer actions happened, where they happened, and who was involved.
4. What harm, if any, you or others suffered because of the alleged discrimination or retaliation.
5. What explanation, if any, your employer or people representing your employer offered for their actions.
6. Who was in the same or similar situation as you and how they were treated. Include information such as the race, color, religion, sex, sexual orientation, gender identity, national origin, disability, or protected status of these individuals, if known.
7. What information you have about federal contracts the company that you worked for had at the time of the discrimination or retaliation you describe in this complaint.



Notes **PLEASE SEE BELOW**.

# Do you think the discrimination includes or affects others?

Do you believe other employees or applicants were treated the same way as you described above?

☑ Yes

☐ No

# Do you have an attorney or other representative?

If you are represented by an attorney, or another person, or an organization, please provide their contact information below.

Name (First, Middle, Last):

Street Address:

City:

State:

Zip Code:

Telephone Number:

E-mail:

Who should we contact if we need more information about your description of what occurred?

☑ You

☐ Your Representative

# Signature and Verification

I declare under penalty of perjury that the information given above is true and correct to the best of my knowledge or belief. A willful false statement is punishable by law.

I hereby authorize the release of any medical information needed for this investigation.

Signature of Complainant: Fred Valdez, Jr.

Date: 12/31/2020

Form CC-4 (Revised 5/2020)

**Fred Valdez, Jr.       OFCCP Complaint Items 1-7.       December 2020**

1. What actions the employer took against you

In Fall 2018, I joined a group of Hispanic history professors who had formed an Equity Committee that was examining salary disparities within their department. A similar problem existed in my department of anthropology, affecting Mexican origin professors, including me. Subsequently, we convened a meeting with other Hispanic Full Professors, and we realized that

they too were underpaid compared to their non Hispanic peers and had experienced similar forms of academic discrimination within their departments. By then the Independent Equity Committee had obtained data from Vice Provost Edmond Gordon that confirmed the salary disparities. In October of 2019, our committee completed a report that formally notified UT administrators about ongoing inequities that constitute bias and discrimination against Hispanic employees. For example, it shows that in FY 2016 to 2017, the 47 full time Hispanic full Professors at UT Austin were each paid a mean annual compensation of 25,342 dollars  less than the 758 White full professors who were full time, a difference of minus 13 percent.  This disparity is worse than the grave disparity between the compensation of male and female faculty identified in UTs 2008 Gender Equity Report, that On average across the University in 2007, female full professors earned 9,028 dollars less than men. That disparity of  minus 7 percent was subsequently remedied by means of central administration raises for female faculty. Unfortunately, the gender report did not provide data on Hispanic Full Professor females. Furthermore, the University has failed to address our concerns after submitting our report, which is an issue addressed below in questions numbered 5 and 6.  See Independent Equity Committee Report.

In my case, although my productivity is higher than other professors, my salary compensation is lower. In the anthropology department, it is my experience and position that faculty of Mexican descent are discriminated against on the basis of national origin. Our salaries are much lower than faculty who have similar or less publication and service records. Additionally, for years we have not been selected or even asked by the chairs to serve in leading administrative positions, a form of marginalization, which in turn can affect compensation. Chair of Committees such as the GSC, Graduate Admissions, Tenure and Promotion, Associate Chair, and Graduate Advisor are among the significant service options or opportunities never made available.

In the history of UT and the College of Liberal Arts, I was the first Hispanic archaeologist hired. For that matter, I am also the first Mexican American PhD in archaeology in the USA.

In 2017 to 2018, my salary was 101,248 dollars, yet I had more scholarly publications in print than many other faculty in Anthropology who had higher salaries.  This disparity is alarming. My national and international reputation as a leading researcher and scholar in my field has been clear and evident, yet it remains undervalued. I have been invited to serve and present papers at several significant organized conferences in the USA, Latin America, Japan, and China. I have received a Fulbright Fellowship to Guatemala and have been part of several NSF and National Geographic funded research grants. I have organized and directed field research annually for more than 25 years which is far more than any other colleague.

My rate of publishing scholarly works is as high or higher than that of at least five full Professors who currently earn more than me, including Dr. Rosen, Dr. Covey, Dr. Shapiro, Dr. Strong, Dr. Kappelman, and Dr. Strum. This is not simply an issue of less compensation, but not even equal pay for similar or more work.

I have been the reviewer for 22 external tenure and full professor promotion reviews, and I currently serve as a member of four editorial boards of professional publications in my field. I have also received significant field and lab research funding both private and peer reviewed. In the training of my graduate students, I have one former student at the Chicago Field Museum,

one in a Supervisory position at National Geographic, 8 at universities as professors, and two in significant posts of private industry.

I helped to organize, with Dr. Menchaca of my department, the US Mexico Borderlands Program in Anthropology, which served to diversify graduate students in the department. I have mentored and chaired the dissertations of more than 20 graduate students including students of diverse backgrounds. Several courses I teach at UT are cross listed with the Lozano Long Institute of Latin American Studies and the Indigenous Studies Program. I have also remained one of the more active and productive professors in our department to provide student opportunities through Conference Courses and Internships.


2. Why you believe those actions were based on your race color, religion, sex, sexual orientation, gender identity, national origin, disability, veteran status, and or inquiries about, discussions, or disclosures of your pay or the pay of others, and or in retaliation for filing a complaint, participating in discrimination proceedings, opposing unlawful discrimination, or exercising any other rights protected by OFCCP.

I know that these allocations of disparate pay are based on ethnicity, being of Mexican Hispanic descent, and race, not being non Hispanic White employees or others, because these disparities are

A.  Pay inequity issues are distinct to Hispanic full Professors, that is, Asian, White, Black employees are not affected by such a large and constant annual pay gap.

B. Consulting multiple Hispanic professors, we found that we did not get promotions to positions of leadership, unlike our non Hispanic colleagues.

C. We analyzed salaries and resumes of 90 faculty in the College of Liberal Arts, including 13 Hispanic full professors in four large departments, constituting 27 percent of all Hispanic full Professors at UT Austin, and we found that most of them are paid near the bottom of the pay scales, even though 54 percent are in the Top10 most published in their departments.

D. An analysis of covariance with one tailed hypothesis testing, adjusted for covariates of gender, years employed, and publications, showed that the mean compensation of Hispanic faculty was statistically significantly lower than the mean compensation of White faculty.

E. The salary disparity remains even when we statistically controlled for departments, confirming that it is not because one is comparing apples to oranges for example, White professors in engineering with Hispanic professors in Education.

F. We also found a near zero correlation between the compensation and quantity of publications of only Hispanic faculty, contrary to the strong correlations found for Asian, Black, and White faculty.

G. The Editorial Boards of prominent state newspapers, the Austin American Statesman, and the Houston Chronicle, have publicly called upon UT Austin to urgently fix this pay disparity, yet UT administrators have not acted.

H.  Most importantly, UT Austin provided IRRIS charts to Representative Gina Hinojosa, showing that in contrast to White full professors, Hispanic full professors have constantly had lower salaries for 9 consecutive years 2010 to 2018, an average of 12 percent lower per year.

K. In the Department of Anthropology I have experienced a history of discrimination because there is a gender and racial hierarchy, with Mexican American professors excluded in order that more funds and resources are available to white professors. This pattern can be seen in salary compensation that started when I was first hired.  In 1988, Joel Sherzer, the chair determined the salary, and that year a group of assistant professors were hired and I was not aware that our salaries differed. I was hired, as a Harvard PhD at 30,000 dollars, Martha Menchaca was hired at 29,500 dollars and is a Stanford PhD, Kathleen Stewart white female, as a U Michigan PhD was paid 30,000 dollars, John Kappleman white male, Harvard PhD was hired at 33,000 dollars.  The following year another white male assistant professor was hired, Sam Wilson, and he was also given the starting salary of 33,000 dollars, similar to the other white male. Wilson received his PhD from the U of Chicago. Note that Kappelman and I both received our PhDs from Harvard University in 1987, we both had a full year of teaching at the university level before coming to UT Austin, and I had more research and publication, yet I was paid 10 percent less.

To the latter point, I had requested of the then department chair for a 10 to 15 percent increase over the 30,000 dollar offer and I was told that ALL entering assistant professors were being paid the same and it would not be fair to the others to pay me more. Clearly this was an untruth. The Hispanic faculty were hired with the lower salaries despite having earned Ph.D. degrees from top universities in our fields, Harvard and Stanford.

L. Forms of discrimination temporarily lessened when several faculty of color were hired by the year 2001, however, by 2015 nine faculty of color had left. In 2017, a white faculty member also left, Charles Hale, who accepted a position at UCSB as Dean of the College of Liberal Arts. Hale wrote a farewell to the Anthropology faculty, noting dissatisfactions that he was disheartened with, such as the direction that our department had taken in recent years. He complained against the lack of diversity, the governance structure that undermined diversity and had led to a shift in graduate student admissions to be nearly all white. When faculty of color left, their positions were filled with white faculty, nearly all males.

The year Dr. Hale left, we discovered that the chair of the department Samuel Wilson, had transferred 200,000 dollars in university funds given to the Borderlands Program, to be used instead for other departmental sources. This information was brought to my attention accidentally during an admissions committee meeting and I informed Dr. Menchaca of this discrepancy. We complained and were able to regain 150,000 dollars of the funds for the program. The initial loss of those funds affected our ability within the Borderlands Program to move forward and complete part of our academic mission.

Furthermore, during the tenure of Dr. Samuel Wilson as chair of the department, I was not credited for my work in providing student and department service in the form of Conference Courses which are collected by the department from all faculty and the credits are then used to give faculty time off from teaching for research or writing. I learned through a colleague, that Wilson confided in, that I accounted for about 90 percent of Conference Courses in the department over several years, yet I never got this directly nor compensated for those efforts, even though I requested such compensation.

M. Retaliation and intimidation, It is my assessment that over the years, my ongoing support for diversity and equal employment practices have affected the subjective manner merit is awarded in my department. The main method has been lower salary compensation, and other forms of retaliation and intimidation to prevent professors of Mexican descent from having a role in the administration of the department.

Several examples of subtle retaliation or intimidation have been felt from action by former chairs. As examples are actions by a former chair, James Brow, who took from my field research program the support of a Teaching Assistant. He claimed that the college took back the funding for that position, which was not true, he took the position to use internally. In another case, by the subsequent chair, Sam Wilson, was that I had secured funding for research equipment from the Deans Office and all I need was the formal request through my department chair. Wilson refused claiming that I was misinformed, although it turned out I was able to obtain the funds through alternate means. I was also kept from going up for promotion to Full Professor by the then chair with varying excuses that caused me to lose income while waiting to be allowed to go up for promotion. All of these actions by former Department Chairs impacted me personally, professionally, and clearly in compensation.

3. When the employer actions happened, where they happened, and who was involved.

The salaries of professors like myself are set by Department Chairs and Deans. Each October 1st, the new salaries become effective, in payroll. Yet the University has no structure in place to ensure that employees of a higher rank. For example, Professors are paid more than employees of a lower rank such as Associate Professors, or Assistant Professors, therefore, when Chairs and Deans allocate raises and new employee salaries, they manifest carelessness, bias, or favoritism, by granting higher salaries to some employees. Throughout the years, the sum of such acts creates a cumulative effect of discrimination against Hispanic employees, above all, as evidenced in our lower pay, in nearly all departments of the university, and contrary to our productivity and rank. In addition, in the anthropology department there are rules for merit raises, but these rules are not enforced.

4. What harm, if any, you or others suffered because of the alleged discrimination or retaliation.

Other Hispanic Full Professors and I have suffered the damage of annual disparate pay, in the amount of 12 percent less than our non Hispanic White coworkers, plus loss of interests on such lost earnings. Additionally, social capital, respect, inclusion, and promotions to positions of

leadership are granted more often to faculty with higher salaries, while those of us who are Hispanic and underpaid are granted fewer promotions to positions of leadership, awards, opportunities, etc. We quantified this in terms of our lack of endowment awards, teaching awards, and administrative roles.


5. What explanation, if any, your employer or people representing your employer offered for their actions.

In writings and in person, the past President Gregory Fenves and the Provost McInnis both acknowledged in Oct.18, Oct.30, Nov.11, 2019, Feb.18, Feb.21, 2020 that inequities in salaries do exist and that they affect Hispanic faculty. They spoke of it as something unfortunate and regrettable, but did not offer a clear explanation. Provost McInnis did say that the university is very decentralized so that problems do arise and accumulate. And, she said that the university lacked centralized data systems to track such disparities. However, McInnis and Fenves both resigned in mid 2020.

We wrote a formal letter to the new President and Provost on August 3, but received no reply.

For the Department of Anthropology, regarding salary, the most common excuse for a lack in increased compensation is insufficient salary funds given to the department for merit. This may be true, but Mexican Americans remain at the bottom for consideration at every turn, but seems especially true when resources are low.


6. Who was in the same or similar situation as you and how they were treated. Include information such as the race, color, religion, sex, sexual orientation, gender identity, national origin, disability, or protected status of these individuals, if known.

In 2008, our university recognized a grave disparity between the compensation of male and female faculty, which it identified in UTs 2008 Gender Equity Report, that On average across the University in 2007, female full professors earned 9,028 dollars less than men. UT administrators rightly recognized that that pay gap was unacceptable, and set to fix it. That disparity of minus 7 percent was subsequently remedied by means of central administration raises for female faculty.

Presently, the pay gap for Hispanic full Professors is far larger, namely minus 12 percent per year. We estimate that, 47 affected Hispanic full Professors, both men and women, as of 2017, plus multiple others in lower ranks, maybe around 10 or 20 Associate Professors. In the former group the differences are statistically very large minus 12 percent. In the latter group, the differences affect more clearly certain individuals, not necessarily most of them. However, if one does not control for departments as was not done in the OFCCP intervention with Princeton University, then clearly Hispanic professors in all ranks are affected. Our Hispanic Equity Report found annual pay gap differences compared to non Hispanic White employees of minus 25,342 dollars for Hispanic full Professors, minus 10,647 dollars for Hispanic Associate Professors, and minus 18,930 dollars for Hispanic Assistant Professors, at UT Austin.

7. What information you have about federal contracts the company that you worked for had at the time of the discrimination or retaliation you describe in this complaint.

There are many federal contracts including with the Department of Defense, but I'm certain there are contracts with other federal agencies as well. These in addition to the National Science Foundation, National Endowment for the Humanities, and National Institute of Health.

**From:** OFCCP Complaints OFCCPComplaints@DOL.GOV
**Subject:** OFCCP Complaint Form
**Date:** January 7, 2021 at 7:46 PM
**To:** OFCCP-SW-CC4 - ESA OFCCP-SW-CC4@dol.gov



**Complaint Involving Employment Discrimination
Federal Contractor or Subcontra**

Please read the instructions before completing thi

OMB: 1250-0002
Expires: 5/31/2023

Reset Form    Print Form

| | |
|---|---|
| **How can we reach you?** | Name (First, Middle, Last):  Emilio Zamora<br>Street Address:  2653 Barton Hills Drive<br>City:  Austin<br>State:  TX   Zip Code:  78704<br>Telephone Number:  (512) 739-0168<br>☐ Home ☐ Work ☑ Cell<br><br>E-mail:  E.Zamora@austin.utexas.edu<br>Have you filed these allegations of employment discrimination with another federal or local agency?<br><br>☐ Yes ☑ No<br><br>If yes, provide the agency and date filed: _____<br>Contact Name: _____ Phone Number: _____ |
| **Who can we contact if we cannot reach you?** | Name (First, Middle, Last):  Angela Valenzuela<br>Street Address:  2653 Barton Hills Drive<br>City:  Austin<br>State:  TX   Zip Code:  78704<br>Telephone Number:  (512) 739-0078<br>☐ Home ☐ Work ☑ Cell<br><br>E-mail:  Valenz@Austin.utexas.edu |
| **What is the name of the employer that you believe discriminated or retaliated against you?** | Company Name:  University of Texas at Austin<br>Street Address:  110 Inner Circle Drive<br>City:  Austin<br>State:  TX   Zip Code:  78712<br>Telephone Number:  (512) 471-3434<br>**Give the date(s) and times you believe you were discriminated against:**<br>October 1, 2020- |

| | | | | |
|---|---|---|---|---|
| **Why do you believe your employer discriminated or retaliated against you?** | ☑ Race<br>☐ American Indian or Alaska Native<br><br>Indicate Tribal Affiliation:<br><br><br>☑ Asian<br><br>☐ Black or African American<br><br>☐ Native Hawaiian or Other Pacific Islander<br><br>☑ White | ☑ National Origin<br>☑ Hispanic or Latino<br>☐ Other<br>☐ Color<br>☐ Religion<br>☐ Sex | ☐ Sexual Orientation<br>☐ Gender Identity<br>☐ Inquiring About Pay<br>☐ Discussing Pay<br>☐ Disclosing Pay | ☐ Protected Veteran Status<br>☐ Disability<br>☐ Retaliatio |

**How did you learn that you could file a complaint with OFCCP?**

☑ Internet ☐ Poster ☐ Community Organization ☐ OFCCP Meeting/Event ☐ Brochure ☐ Other

**Your Complaint:**

**Please describe below what you think the employer did or didn't do that you believe caused discrimination or retaliation, including:**

1. What actions the employer took against you.
2. Why you believe those actions were based on your: race; color; religion; sex; sexual orientation; gender identity; national origin; disability; veteran status; and/or inquiries about, discussions, or disclosures of your pay or the pay of others; and/or in retaliation fo filing a complaint, participating in discrimination proceedings, opposing unlawful discrimination, or exercising any other rights protec by OFCCP.
3. When the employer actions happened, where they happened, and who was involved.
4. What harm, if any, you or others suffered because of the alleged discrimination or retaliation.
5. What explanation, if any, your employer or people representing your employer offered for their actions.
6. Who was in the same or similar situation as you and how they were treated. Include information such as the race, color, religion, se sexual orientation, gender identity, national origin, disability, or protected status of these individuals, if known.
7. What information you have about federal contracts the company that you worked for had at the time of the discrimination or retalia you describe in this complaint.

I am sending my responses to these questions by email. I have been unable to enter them without any of the symbols indicated. Pleas me know if you received my email. Emilio

| Do you think the discrimination includes or affects others? | Do you believe other employees or applicants were treated the same way as you described above?<br><br>☑ Yes ☐ No |
| --- | --- |
| Do you have an attorney or other representative? | If you are represented by an attorney, or another person, or an organization, please provide their contact informat below.<br><br>Name (First, Middle, Last): _____<br>Street Address: _____<br>City: _____<br>State: ____ Zip Code: _____<br>Telephone Number: _____<br>E-mail: _____<br>Who should we contact if we need more information about your description of what occurred?<br><br>☑ You ☐ Your Representative |
| Signature and Verification | I declare under penalty of perjury that the information given above is true and correct to the best of my knowledg belief. A willful false statement is punishable by law.<br><br>I hereby authorize the release of any medical information needed for this investigation.<br><br>Signature of Complainant: _Emilio Zamora_____ Date: _1/7/2021_____ |

Form CC-4 (Revised 5

From: **Zamora, Emilio** e.zamora@austin.utexas.edu
Subject: Addendum
Date: January 7, 2021 at 7:49 PM
To: OFCCP-SW-CC4 - ESA OFCCP-SW-CC4@dol.gov



CAUTION - The sender of this message is external to the DOL network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to spam@dol.gov.

I submitted a discrimination complaint under my name, Emilio Zamora. I could not enter the following responses with successfully getting past the "symbols" that I was to delete. I deleted as many as I noticed but apparently didn't do a complete job. Please let me know if you received this, by email or phone, 521 739-0168. Thank you. Emilio

1. What actions the employer took against you.

The university has not corrected pay inequities affecting Hispanic faculty like myself despite requests to assess and resolve the problem. I have made this request individually and as a member of the Hispanic Equity Committee, a group of Hispanic full professors who have been petitioning for equity regarding Latino faculty at the University of Texas at Austin.

Between 2017 and 2018, two Hispanic colleagues in the History Department and I had informal conversations on a shared sense that the University was paying us at a lower rate than fellow White faculty with equal lengths of service and comparable records of scholarship and service. We went before the general faculty to propose an Equity Committee to conduct preliminary analysis of the available data. The Department faculty established the committee on May 2, 2018. The Committee presented its early findings within a year but we did not receive an appropriate and satisfying response. In the meantime, we joined with other Hispanic faculty in my same job category and rank of full Professor, and we realized that they too were underpaid relative to their non-Hispanic peers. In summer 2018, we approached an administrator, Vice Provost Dr. Ted Gordon to inquire about what seemed a universitywide pay inequity involving Latinos. He provided charts that confirmed our suspicions. We subsequently met with the Provost's Council for Racial and Ethnic Equity and Diversity, CREED, on Sept.18, 2018, to present the perceived problems affecting Hispanics, especially disparities in compensation. CREED convened seven subcommittees to work on a Hispanic Faculty Initiative. The Committee delivered its report to the Provost in May 2019; however, we it did not analyze the issue of compensation. Our group, which had grown to eight Hispanic full Professors in the College of Education, formed the Independent Equity Committee and prepared the Hispanic Equity Report, completed on October 8, 2019. Our Committee submitted the report to UT administrators about ongoing inequities that "constitute bias and discrimination against Hispanic employees." For example, it shows that in 2016-17, each of 47 fulltime Hispanic full Professors at UT Austin were each paid a mean annual compensation of 25,342 less than the 758 White full professors who were full-time, a difference of minus 13 percent. This difference is worse than the grave disparity between the compensation of male and female faculty identified in the university's 2008 Gender Equity Report, that: "On average across the University in 2007, female full professors earned 9,028 less than men." That disparity of minus 7 percent was subsequently remedied by means of central administration raises for female faculty.

By this time—around the latter part of 2019—I came to believe that my case was one of the most egregious.

2. Why you believe those actions were based on your: race; color; religion; sex; sexual orientation; gender identity; national origin; disability; veteran status; and/or inquiries about, discussions, or disclosures of your pay or the pay of others; and/or in retaliation for filing a complaint, participating in discrimination proceedings, opposing unlawful

discrimination, or exercising any other rights protected by OFCCP.

For years, my employer has hired new faculty at salaries exceeding mine and has assigned administrative positions to White, Black, and Asian colleagues, but not to me. In 2017-18, among 63 faculty in the History department, I was the number 12 faculty member with most scholarly publications, yet 22 faculty earned more than me despite each having fewer publications and awards, including 7 employees of lower rank. In 2018-19, the average 9-month salary of White full Professors in my department, not counting administrators, was 153,257. Yet my salary was only 111,120. Contrary to my equal or higher rank, more years of service, and higher productivity, I have been paid far less than many employees in my department. I therefore seek equal pay, back pay, and interest on back pay, and all other relief available by law. Also, I demand that my employer establish structures of equal pay, based on years, rank, and productivity and make available to the public full compensation data for all UT faculty that includes all forms of payment, including base salaries and stipends, beginning in 2000. This last point is important because the university does not make available the full compensation data, most probably because it reveals more serious pay inequities since these data includes stipends and other forms of pay that are attached to administrative assignments that are not usually available to Latino and Latina faculty.

I know that these allocations of disparate pay are based on ethnicity , or,being Hispanic, and race, or not being non-Hispanic White employees or others, and possibly age since I am one of the most senior members of a department with about 55 faculty. The following are my reasons

Distinct to Hispanic full Professors, that is, Asian, White, Black employees are not affected by such a large, constant annual pay gap

Consulting multiple Hispanic professors we found that we did not get promotions to positions of leadership, unlike our non-Hispanic colleagues

We analyzed salaries and resumes of 90 faculty in the College of Liberal Arts, including 13 Hispanic full professors in four large departments, constituting 27 percent of all Hispanic full Professors at UT Austin, and we found that most of them are paid near the bottom of the pay scales, even though 54 percent are in the Top 10 most published in their departments

An analysis of covariance with one-tailed hypothesis testing, adjusted for covariates of gender, years employed, and publications, showed that the mean compensation of Hispanic faculty was statistically significantly lower than the mean compensation of White faculty

The salary disparity remains even when we statistically controlled for departments, confirming that it is not because one is comparing apples to oranges. For example, White professors in engineering with Hispanic professors in Education.

Also, we found a near zero correlation between the compensation and quantity of publications of only Hispanic faculty, contrary to the strong correlations found for Asian, Black, and White faculty; and the Editorial Boards of prominent state newspapers, the Austin American-Statesman, and the Houston Chronicle, have publicly called upon UT Austin to urgently fix this pay disparity. Yet UT administrators have not;

Most importantly, UT Austin provided IRRIS charts to State Representative Gina Hinojosa, showing that in contrast to White full professors, Hispanic full professors have constantly had lower salaries for 9 consecutive years between 2010 and 2018, an average of 12 percent lower per year.

3. When the employer actions happened, where they happened, and who was involved. The salaries of professors like myself are set by Department Chairs and Deans. Each October 1, the new salaries become effective, in payroll. Yet the University has no

structure in place to ensure that employees of a higher rank, for example, Professor, are paid more than employees of a lower rank, for example, Associate Professor, or Assistant Professor, therefore, when Chairs and Deans allocate raises and new employee salaries, they manifest carelessness, bias, or favoritism, by granting higher salaries to some employees. Throughout the years, the sum of such acts creates a cumulative effect of discrimination against Hispanic employees, above all, as evidenced in our lower pay, in nearly all departments of the university, and contrary to our productivity and rank.

4. What harm, if any, you or others suffered because of the alleged discrimination or retaliation.

During the last nine or ten years, Hispanic full Professors at the university have suffered the damage of annual disparate pay, in the amount of 12 percent less than our non-Hispanic White coworkers, plus loss of interests on such lost earnings. Also, social capital, respect, inclusion, and promotions to positions of leadership are granted more often to faculty with higher salaries, while those of us who are Hispanic and underpaid are granted fewer promotions to positions or leadership, awards, opportunities, etc. We quantified this in terms of our lack of endowment awards, teaching awards, and administrative roles.

5. What explanation, if any, your employer or people representing your employer offered for their actions.

In writings and in person, the past President Gregory Fenves and the Provost Maurie McInnis acknowledged on Oct.18, Oct.30, Nov.11, 2019, Feb.18, and Feb.21, 2020 that inequities in salaries exist and that they affect Hispanic faculty. They spoke of it as something unfortunate and regrettable, but did not offer a clear explanation. McInnis did say that the university is "very decentralized" so that problems do arise and accumulate. And, she said that the university lacked centralized data systems to track such disparities.However, McInnis and Fenves both resigned in mid-2020.We wrote a formal letter to the new President and Provost on August 3, but received no reply.

6. Who was in the same or similar situation as you and how they were treated. Include information such as the race, color, religion, sex, sexual orientation, gender identity, national origin, disability, or protected status of these individuals, if known.

In 2008, our university recognized a grave disparity between the compensation of male and female faculty, which it identified in the university's 2008 Gender Equity Report, that: "On average across the University in 2007, female full professors earned 9,028 less than men." UT administrators rightly recognized that the pay gap was unacceptable, and set out to fix it. That disparity of minus 7 percent was subsequently remedied by means of central administration raises for female faculty. Presently, the pay gap for Hispanic full Professors is far larger, namely minus12 percent per year. We estimate that, 47 affected Hispanic full Professors, both men and women, as of 2017, plus multiple others in lower ranks, around 10 or 20 Associate Professors. In the former group the differences are statistically very large minus12 percent. In the latter group, the differences affect more clearly certain individuals, not necessarily most of them. However, if one does not "control for departments" as was not done in the OFCCP intervention with Princeton University, then clearly Hispanic professors in all ranks are affected. Our Hispanic Equity Report found annual pay gap differences, compared to non-Hispanic White employees, of -25,342 for Hispanic full Professors,-10,647 for Hispanic Associate Professors, and -18,930 for Hispanic Assistant Professors, at UT Austin.

7. What information you have about federal contracts the company that you worked for had at the time of the discrimination or retaliation you describe in this complaint. Consult the following on the Internet: US Federal contracts awarded to The University of Texas At Austin in United States of America. Search 727 federal contracts awarded to

The University of Texas At Austin in United States of America since fiscal year 2015.

# Ex. B

**U.S. Department of Labor**        Office of Federal Contract Compliance Programs
Southwest and Rocky Mountain Regional Office
525 South Griffin Street, Room 840
Dallas, TX 75202
Tel:  (972) 850-2550



September 29, 2023

**Via Electronic Mail:  almartinez1905@gmail.com**
**Read and Delivery Receipt Requested**

U.S. DEPARTMENT OF LABOR
OFFICE OF FEDERAL CONTRACT COMPLIANCE PROGRAMS

OFCCP Complaint No. I00300474

Alberto A. Martinez                                    COMPLAINANT
409 E 38th St., Apt 203
Austin, TX 78705

The University of Texas at Austin                      CONTRACTOR
10 Inner Campus Drive
Austin, TX 78705

## NOTIFICATION OF RESULTS OF INVESTIGATION

On October 26-28, 2021, the U.S. Department of Labor, Office of Federal Contract Compliance
Programs (OFCCP) conducted an investigation of the allegation of discrimination based on ethnicity
(Hispanic or Latino), color, and national origin made in the complaint of Alberto A. Martinez filed on
October 14, 2020, and pursuant to procedures for complaints of employment discrimination filed
against employers holding government contracts or subcontracts. The results of the investigation are
as follows:

1. The University of Texas at Austin (contractor) is a nonexempt government contractor subject to
   the requirements of Executive Order 11246 (EO 11246), as amended; Section 503 of the
   Rehabilitation Act of 1973 (Section 503), as amended; the Vietnam Era Veterans' Readjustment
   Assistance Act of 1974, as amended (VEVRAA); and an employer of 15 or more persons subject
   to Title VII of the Civil Rights Act of 1964 (Title VII) and Title I of the Americans with
   Disabilities Act of 1990, as amended (ADA).

2. Alberto A. Martinez (complainant) is a Hispanic male protected by EO 11246 and Title VII. The
   complaint was properly filed under the provisions of EO 11246.

3. The complainant alleges the contractor violated its obligations under the non-discrimination
   provisions of EO 11246 and Title VII, specifically claiming compensation and promotion
   discrimination based on ethnicity, color, and national origin. Relying upon the Hispanic Equity
   Report prepared and released by the Independent Equity Committee, the complainant alleges that
   Hispanic professors with superior achievements and longer tenures are paid significantly less
   than their non-Hispanic counterparts, a problem that is aggravated by the contractor's practice of
   hiring new professors at a lower rank but earning almost the same or more than higher-ranked
   tenured professors. Per the complainant, the university has no structure in place to avoid such
   acts, thus creating a cumulative effect of pay discrimination against Hispanic faculty in nearly all

departments of the university, and contrary to productivity and rank.

The complainant also alleges that promotions to positions of leadership and/or committees are granted more often to faculty with higher salaries, while those who are Hispanic and underpaid are granted fewer promotions to positions of leadership, awards, and opportunities. These denials of promotions to positions of leadership are quantified in terms of lack of endowment awards, teaching awards, and administrative roles for Hispanic faculty, thus having a direct negative effect in the complainant's total compensation.

4. The contractor denies the allegations that the complainant is underpaid and/or excluded from promotions to positions of leadership because of his ethnicity or national origin. The contractor contends that the complainant has a documented history of pay adjustments and appointments to positions of leadership. Per the contractor, the complainant's current annual salary already reflects one salary raise given proactively to faculty most likely to receive offers from other educational institutions. Such raise makes the complainant ineligible to qualifying for any subsequent equity increases intended to counteract pay disparities caused by salary compression. The contractor also noted that the complainant currently serves on several selective and prestigious committees, including those convened to consider issues of faculty salary and equity.

In addition, the contractor argues that bringing a pattern of practice claim using the Hispanic Equity Report is inappropriate as it relies on old and incomplete salary data, is misleading, and contains methodological flaws, thus making it valueless from an evidentiary standpoint. Specifically, the contractor states that when a more comprehensive methodology is employed, it reveals that there is no correlation between a faculty member's salary and the complainant's Hispanic ethnicity and/or national origin. Lastly, the contractor contends that using updated salary data accounting for the raises given to faculty (including the complainant), a more standard model specification, or a larger sample eliminates any evidence of a statistically significant relationship between race/national origin and salary.

5. Our investigation indicates that the contractor did not discriminate against the complainant based on his race and/or national origin.

   a. Compensation: The compensation discrimination allegations were presented to the contractor's administration several times, the last one through the Hispanic Equity Report. OFCCP conducted an independent regression analysis considering the salary data used by the Hispanic Equity Report and decided the analysis presents conclusions that are invalid due to a faulty methodology. Further, OFCCP concluded that if proper statistical standards had been utilized it would have shown no statistically significant disparity existed against Hispanic Professors in 2017 in the four academic departments included in the Hispanic Equity Report.

   OFCCP also conducted an independent regression analysis considering the salary data the contractor used for its own 2017 & 2019 pay data statistical analyses in reply to the Hispanic Equity Report and again found no disparity against Hispanic faculty at any rank.

   b. Promotion opportunities: Regarding the promotion discrimination allegations, OFCCP did not find evidence to confirm the complainant's allegations that promotions to positions of leadership and/or committees are granted more often to faculty with higher salaries, while those who are Hispanic and underpaid faculty are granted fewer promotions to positions of leadership, awards, and/or opportunities. OFCCP's analysis of records and interviews with the contractor's officials involved in this process revealed that Hispanic faculty have long

histories of appointments to positions of leadership. OFCCP did not find evidence of professors being underpaid are failing to be promoted due to their race/ethnicity.

Finally, as it relates to the complainant specifically, OFCCP confirmed that the complainant received pay increases commiserate with his positions and has been appointed to serve in several prestigious committees, including those convened to consider issues of faculty salary and equity.

OFCCP's investigation found insufficient evidence that the contractor violated its obligations under the nondiscrimination and affirmative action provisions of EO 11246, or under the nondiscrimination provisions of Title VII. This determination concludes the processing of this complaint by OFCCP.

If you, the complainant, wish to pursue your complaint further under Title VII, you should follow the instructions in the enclosed "Notice of Right-to-Sue" as set forth in the regulations at 29 CFR § 1601.28(e).

The Regional Director of the Office of Federal Contract Compliance Programs may, for reasonable cause, reconsider or order the reconsideration of this determination. A request for reconsideration based on reasonable cause should be addressed, within thirty (30) days of receipt of this notification to:

Regional Director, OFCCP
U.S. Department of Labor
525 S. Griffin St., Room 840
Dallas, TX 75202

Such a request should be accompanied by affidavits, signed testimony of supervisory or co-workers, and other written documentation which would substantially alter OFCCP's findings in this case.

On behalf of the United States Department of Labor,

LAQUANDRA ADEBAJO                                      9/29/2023
Director of Regional Operations                              Date
Southwest & Rocky Mountain Region

Enclosures:     Notice of Right-to-Sue
                Information related to filing suit under Title VII and Title I of the ADA

cc:     Galen Eagle Bull - Deputy Director for Investigation & Adjudication
        galen.eaglebull@austin.utexas.edu

        Adam Arthur Biggs - Assistant Vice President for Legal Affairs
        adam.biggs@austin.utexas.edu

        Norma Guzman – Director, Equal Employment Opportunity Commission
        norma.guzman@eeoc.gov

## U.S. DEPARTMENT OF LABOR
## OFFICE OF FEDERAL CONTRACT COMPLIANCE PROGRAMS

TO: Alberto A. Martinez
    409 E 38th St., Apt 203
    Austin, TX 78705

FROM: Office of Federal Contract
    Compliance Programs
    525 South Griffin Street, Room 840
    Dallas, TX 75202

OFCCP Representative: Jane Suhr, Acting Regional Director

Complaint Number: I00300474

**TO THE COMPLAINANT**: You may file a lawsuit against the contractor under Title VII of the Civil Rights Act of 1964 in federal or state court. **Your lawsuit must be filed within 90 calendar days of receipt of this notice, or your right to sue will be lost.** Please see the enclosed information sheet on filing lawsuits for further information.

With the issuance of this Notice of Right-to-Sue, OFCCP is terminating its processing of your complaint.

An information copy of this Notice has been sent to the below employer as named in your complaint.

The University of Texas at Austin
10 Inner Campus Drive
Austin, TX 78705

On behalf of the United States Department of Labor,

LAQUANDRA ADEBAJO
Director of Regional Operations
U.S. Department of Labor, OFCCP
525 South Griffin, Room 840
Dallas, Texas 75202

9/29/2023
Date

## INFORMATION RELATED TO FILING SUIT
## UNDER TITLE VII AND TITLE I OF THE ADA

This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits and other provisions of State law may be shorter or more limited than those described below.

**PRIVATE SUIT RIGHTS -Title VII of the Civil Rights Act of 1964, as amended (Title VII) or the Americans with Disabilities Act of 1990, as amended (ADA)**

In order to pursue this matter further, you must file a lawsuit against the contractor(s) named in the complaint **within 90 days of receipt of Notice of Right-to-Sue.** Once this 90-day period expires, your right to sue based on the complaint covered by this Notification will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notification.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notification is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the complaint or, to the extent permitted by court decisions, matters like or related to the matters alleged in the complaint. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the contractor has its main office. If you have simple questions, you usually can get answers from the Clerk of the court where you are bringing suit, but do not expect them to write your complaint or make legal strategy decisions for you.

**PRIVATE SUE RIGHTS - Equal Pay Act (EPA)**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment; back pay due for violations that occurred more than **2 years (3 years for willful violations) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/03 to 12/1/03, you should file suit before 7/1/05- not 12/1/05 -in order to recover unpaid wages due for July 2003. This EPA time limit is separate from the 90-day filing period under Title VII or the ADA referred to above. Therefore, if you also plan to sue under Title VII or the ADA, in addition to suing on the EPA claim, suit should be filed within the Title VIII ADA 90-day period **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION -Title VII and the ADA**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, help you to obtain a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).

Requests should be made well before the end of the 90-day period mentioned above, because such requests do **not** relieve you of the requirement to bring suit within 90 days.

## ATTORNEY REFERRAL AND ASSISTANCE  - All Statutes

If you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which the U.S. District Court can hear your case, you may contact an Office of Federal Contract Compliance Programs  (OFCCP) representative at (972) 850 - 2650, who will coordinate with the Equal Employment Opportunity Commission (EEOC) to promptly obtain that information for you. If you need to inspect or obtain a copy of information in OFCCP's  file, please request it promptly in writing and provide the OFCCP complaint number. If you file suit and want to review the complaint file, **please make your review request within 6 months of this Notice.** (Before filing suit, any request should be made within 90 days of the date of the Notification of Results of Investigation.) If you file suit, please send a copy of your Court complaint to:

Norma Guzman - Director
Equal Employment Opportunity Commission
Legacy Oaks Building A
5410 Fredericksburg Road
Suite 200
San Antonio, TX 78229
Phone: (210) 281-7530 / Fax: (210) 281-2522 / Email: sanantonio.intake@eeoc.gov

**U.S. Department of Labor**   Office of Federal Contract Compliance Programs
Southwest and Rocky Mountain Regional Office
525 South Griffin Street, Room 840
Dallas, TX 75202
Tel: (972) 850-2550



September 29, 2023

**Via Electronic Mail: emiliosoliszamora@gmail.com**
**Read and Delivery Receipt Requested**

U.S. DEPARTMENT OF LABOR
OFFICE OF FEDERAL CONTRACT COMPLIANCE PROGRAMS

OFCCP Complaint No. I00300812

| | |
|---|---|
| Emilio Zamora<br>2653 Barton Hills Drive<br>Austin, TX 78704 | COMPLAINANT |
| The University of Texas at Austin<br>10 Inner Campus Drive<br>Austin, TX 78705 | CONTRACTOR |

## NOTIFICATION OF RESULTS OF INVESTIGATION

On October 26-28, 2021, the U.S. Department of Labor, Office of Federal Contract Compliance Programs (OFCCP) conducted an investigation of the allegation of discrimination based on race, ethnicity (Hispanic or Latino), and national origin made in the complaint of Emilio Zamora filed on January 7, 2021, and pursuant to procedures for complaints of employment discrimination filed against employers holding government contracts or subcontracts. The investigation has resulted in the following findings:

1. The University of Texas at Austin (contractor) is a nonexempt government contractor subject to the requirements of Executive Order 11246 (EO 11246), as amended; Section 503 of the Rehabilitation Act of 1973 (Section 503), as amended; the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (VEVRAA); and an employer of 15 or more persons subject to Title VII of the Civil Rights Act of 1964 (Title VII) and Title I of the Americans with Disabilities Act of 1990, as amended (ADA).

2. Emilio Zamora (complainant) is a Hispanic male protected by EO 11246 and Title VII. The complaint was properly filed under the provisions of EO 11246.

3. The complainant alleges the contractor violated its obligations under the non-discrimination provisions of EO 11246 and Title VII, specifically claiming compensation and promotion discrimination based on ethnicity and national origin. Relying upon the Hispanic Equity Report prepared and released by the Independent Equity Committee, the complainant alleges that Hispanic professors with superior achievements and longer tenures are paid significantly less than their non-Hispanic counterparts, a problem that is aggravated by the contractor's carelessness, bias, favoritism, and lack of structure to ensure that higher-ranked faculty are paid more than lower-ranked faculty. The complainant also alleges that Hispanic professors do not get promotions to positions of

leadership, thus having a direct negative effect on the total compensation of Hispanic faculty.

4.  The contractor denies the allegations that the complainant is underpaid and/or excluded from promotions to positions of leadership because of his race, ethnicity, or national origin. The contractor contends that the complainant has a documented record of pay adjustments and a robust history of appointments to positions of leadership. Further, the contractor denies the above compensation allegations by explaining that just like many other Hispanic professors, the complainant received substantial salary increases in addition to other types of support to supplement his salary, including but not limited to course releases for two years (full-time salary for teaching only half-time), an endowment to support research and travel, and a sponsorship paid in his honor.

    The contractor also noted that the complainant has been on his department's two main governing bodies in recent years, the Executive Committee and the Graduate Program Committee; he has twice co-chaired search committees for Borderlands; was named the U.S. Area Chair, a position that gave him responsibility for curricular and scheduling matters; and has been appointed to 13 other positions of leadership during his tenure. The complainant has not expressed any recent interest in serving in a leadership role such as department chair, associate chair, or graduate advisor.

    In addition, the contractor argues that bringing a pattern of practice claim using the Hispanic Equity Report is inappropriate as it relies on old and incomplete salary data, is misleading, and contains methodological flaws, thus making it valueless from an evidentiary standpoint. Specifically, the contractor states that when a more comprehensive methodology is employed, it reveals that there is no correlation between a faculty member's salary and the complainant's Hispanic ethnicity and/or national origin. Lastly, the contractor contends that using updated salary data accounting for the raises given to faculty (including the complainant), a more standard model specification, or a larger sample eliminates any evidence of a statistically significant relationship between race/national origin and salary.

5.  Our investigation indicates that the contractor did not retaliate, intimidate, or discriminate against the complainant based on his race and/or national origin.

    a.  Compensation: The compensation discrimination allegations were presented to the contractor's administration several times, the last one through the Hispanic Equity Report. OFCCP conducted an independent regression analysis considering the salary data used by the Hispanic Equity Report and decided the analysis presents conclusions that are invalid due to a faulty methodology. Further, OFCCP concluded that if proper statistical standards had been utilized it would have shown no statistically significant disparity existed against Hispanic Professors in 2017 in the four academic departments included in the Hispanic Equity Report.

        OFCCP also conducted an independent regression analysis considering the salary data the contractor used for its own 2017 & 2019 pay data statistical analyses in reply to the Hispanic Equity Report and again found no disparity against Hispanic faculty at any rank.

    b.  Promotion opportunities: Regarding the promotion discrimination allegations, OFCCP did not find evidence to confirm the complainant's allegations that Hispanic professors do not get promotions to positions of leadership. OFCCP's analysis of records and interviews with the contractor's officials involved in this process revealed that Hispanic faculty have long histories of appointments to positions of leadership. OFCCP did not find evidence of professors being underpaid are failing to be promoted due to their race/ethnicity.

        Finally, as it relates to the complainant specifically, OFCCP found that the complainant received pay increases commiserate with his appointed positions.

OFCCP's investigation found insufficient evidence that the contractor violated its obligations under the nondiscrimination and affirmative action provisions of EO 11246, or under the nondiscrimination provisions of Title VII. This determination concludes the processing of this complaint by OFCCP.

If you, the complainant, wish to pursue your complaint further under Title VII, you should follow the instructions in the enclosed "Notice of Right-to-Sue" as set forth in the regulations at 29 CFR § 1601.28(e).

The Regional Director of the Office of Federal Contract Compliance Programs may, for reasonable cause, reconsider or order the reconsideration of this determination. A request for reconsideration based on reasonable cause should be addressed, within thirty (30) days of receipt of this notification to:

Regional Director, OFCCP
U.S. Department of Labor
525 S. Griffin St., Room 840
Dallas, TX 75202

Such a request should be accompanied by affidavits, signed testimony of supervisory or co-workers, and other written documentation which would substantially alter OFCCP's findings in this case.

On behalf of the United States Department of Labor,

LAQUANDRA ADEBAJO
Director of Regional Operations
Southwest & Rocky Mountain Region

9/29/2023
Date

Enclosures:    Notice of Right-to-Sue
               Information related to filing suit under Title VII and Title I of the ADA

cc:    Galen Eagle Bull - Deputy Director for Investigation & Adjudication
       galen.eaglebull@austin.utexas.edu

       Adam Arthur Biggs - Assistant Vice President for Legal Affairs
       adam.biggs@austin.utexas.edu

       Norma Guzman - Director
       Equal Employment Opportunity Commission
       Norma.guzman@eeoc.gov

## U.S. DEPARTMENT OF LABOR
## OFFICE OF FEDERAL CONTRACT COMPLIANCE PROGRAMS

TO: Emilio Zamora
2653 Barton Hills Drive
Austin, TX 78704

FROM: Office of Federal Contract
Compliance Programs
525 South Griffin Street, Room 840
Dallas, TX 75202

OFCCP Representative: Jane Suhr, Acting Regional Director

Complaint Number: I00300812

**TO THE COMPLAINANT:** You may file a lawsuit against the contractor under Title VII of the Civil Rights Act of 1964 in federal or state court. **Your lawsuit must be filed within 90 calendar days of receipt of this notice, or your right to sue will be lost.** Please see the enclosed information sheet on filing lawsuits for further information.

With the issuance of this Notice of Right-to-Sue, OFCCP is terminating its processing of your complaint.

An information copy of this Notice has been sent to the below employer as named in your complaint.

The University of Texas at Austin
10 Inner Campus Drive
Austin, TX 78705

On behalf of the United States Department of Labor,

LAQUANDRA ADEBAJO
Director of Regional Operations
U.S. Department of Labor, OFCCP
525 South Griffin, Room 840
Dallas, Texas 75202

9/29/223
Date

## INFORMATION  RELATED  TO FILING SUIT
## UNDER TITLE VII AND TITLE I OF THE ADA

This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits and other provisions of State law may be shorter or more limited than those described below.

**PRIVATE  SUIT RIGHTS -Title VII of the Civil Rights Act of 1964, as amended (Title VII) or the Americans with Disabilities Act of 1990, as amended (ADA)**

In order to pursue this matter further, you must file a lawsuit against the contractor(s) named in the complaint **within 90 days of receipt of Notice of Right-to-Sue.** Once this 90-day period expires, your right to sue based on the complaint covered by this Notification will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notification.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notification is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the complaint or, to the extent permitted by court decisions, matters like or related to the matters alleged in the complaint.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the contractor has its main office. If you have simple questions, you usually can get answers from the Clerk of the court where you are bringing suit, but do not expect them to write your complaint or make legal strategy decisions for you.

**PRIVATE  SUE RIGHTS - Equal Pay Act (EPA)**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment; back pay due for violations that occurred more than **2 years (3 years for willful violations) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/03 to 12/1/03, you should file suit before 7/1/05- not 12/1/05 -in order to recover unpaid wages due for July 2003. This EPA time limit is separate from the 90-day filing period under Title VII or the ADA referred to above. Therefore, if you also plan to sue under Title VII or the ADA, in addition to suing on the EPA claim, suit should be filed within the Title VIII ADA 90-day period **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY  REPRESENTATION -Title VII and  the ADA**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, help you to obtain a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).

Requests should be made well before the end of the 90-day period mentioned above, because such requests do **not** relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND ASSISTANCE  - All Statutes**

If you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which the U.S. District Court can hear your case, you may contact an Office of Federal Contract Compliance Programs  (OFCCP) representative at (972) 850 - 2650, who will coordinate with the Equal Employment Opportunity Commission (EEOC) to promptly obtain that information for you. If you need to inspect or obtain a copy of information in OFCCP's file, please request it promptly in writing and provide the OFCCP complaint number. If you file suit and want to review the complaint file, **please make your review request within 6 months  of this Notice.** (Before filing suit, any request should be made within 90 days of the date of the Notification of Results of Investigation.) If you file suit, please send a copy of your Court complaint to:

Norma Guzman - Director
Equal Employment Opportunity Commission
Legacy Oaks Building A
5410 Fredericksburg Road
Suite 200
San Antonio, TX 78229
Phone: (210) 281-7530 / Fax: (210) 281-2522 / Email: sanantonio.intake@eeoc.gov