UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

ALBERTO MARTINEZ, and       §       No. 1:23-cv-01574-DAE
EMILIO ZAMORA,       §
    *Plaintiffs,*       §
      §
vs.       §
      §
UNIVERSITY OF TEXAS AT       §
AUSTIN, and JAY HARTZELL,       §
In his official and individual capacity,       §
    *Defendants.*       §

ORDER (1) DENYING IN PART AND GRANTING IN PART DEFENDANTS'
MOTION TO DISMISS AND TO STRIKE CLASS ALLEGATIONS, (2)
DENYING PLAINITFFS' MOTION TO STRIKE, AND (3) DENYING
PLAINTIFFS' MOTION FOR LEAVE TO FILE SUR-REPLY

        Before the Court is Defendants' Motion to Dismiss Plaintiffs' First

Amended Complaint and to Strike Class Allegations (Dkt. #17), filed April 12,

2024.  Plaintiffs filed their Response to the motion on May 13, 2024.  (Dkt. # 23.)

Defendants filed their Reply on June 13, 2024.  (Dkt. # 28.)  Also before the Court

is Plaintiffs' Motion to Strike, filed on May 10, 2024 (Dkt. # 20), and Plaintiffs'

Motion for Leave to File Sur-Reply in Opposition to Defendants' Motion to

Dismiss, filed on July 2, 2024.  (Dkt. # 29.)  Defendants filed their responses on

June 7, 2024, and July 16, 2024, respectively.  (Dkts. ## 26, 31.)

        The Court held a hearing on this matter on January 7, 2025.  After

carefully considering the filings and the proceedings at the hearing, and for the

reasons that follow, the Court **DENIES IN PART and GRANTS IN PART** Defendants' Motion to Dismiss and Motion to Strike, **DENIES** Plaintiff's Motion to Strike, and **DENIES** Plaintiffs' Motion for Leave to File a Sur-Reply.

<u>BACKGROUND</u>

This employment discrimination case concerns two Hispanic professors, Albert Martinez ("Martinez") and Emilio Zamora ("Zamora") (collectively "Plaintiffs"), at the University of Texas Austin ("UT Austin"). (Dkt. # 12 at 1.) Plaintiffs filed this lawsuit individually and on behalf of all other Hispanic faculty ("Class Members"). (<u>Id.</u>)

Plaintiffs allege that Defendants UT Austin, and President Jay Hartzell (collectively "Defendants"), in his official and individual capacity, engaged in unlawful national origin/Hispanic discriminatory employment practices, including in pay, promotions, endowments, and appointments to compensated positions of leadership. (<u>Id.</u> at 2.)

Martinez began working for UT Austin in 2005 as a lecturer in the History Department. (<u>Id.</u> at 5.) He was subsequently promoted to a full professor in 2015. (<u>Id.</u>) Zamora was hired as a full professor in the History Department in 2000. (<u>Id.</u>) Since then, each has published books and engaged in other scholarly activities while working for UT Austin. (<u>Id.</u>)

In or about 2017 and 2018, Martinez and Zamora allege they began having informal conversations amongst themselves and with other Hispanic faculty regarding their shared sense that UT Austin was paying them at a lower rate than fellow non-Hispanic faculty with comparable lengths of service, records of scholarship, and teaching.  (Id. at 6.)  On May 2, 2018, Martinez, Zamora, and other Hispanic professors went before the History Department's faculty and supervisor with their concerns that Hispanic faculty were being paid less and received fewer promotions and appointments than non-Hispanic faculty.  (Id. at 10.)  The Hispanic professors also requested rectification of the disparities in compensation and lack of promotion to positions of leadership.  (Id.)  In response, an "Equity Committee" was started on the same day, which included both Martinez and Zamora.  (Id.)

Martinez and Zamora, as part of the Equity Committee, reviewed employment and salary information and presented a draft report to the department on or about October 15, 2018, which highlighted and opposed the fact that Hispanic faculty as well as other minority faculty were being paid lower salaries than White faculty within the department that had a "less-accomplished publication record."  (Id.)

On or about September 18, 2018, UT Austin's Vice Provost Dr. Edmund Gordon arranged for a group of Hispanic professors, including Martinez

and Zamora, to meet with the Provost's Council for Racial and Ethnic Equity and Diversity ("CREED"), to present the disparities for Hispanics and particularly the compensation disparities.  (Id. at 11.)  CREED created seven subcommittees to work on a Hispanic Faculty Initiative.  (Id.)  A report with the findings was delivered to the Provost at the end of that academic year, in May 2019.  (Id.)

Martinez and Zamora allege they also gathered with six Hispanic full Professors in different Departments (Anthropology, English, Sociology, Psychology) in what they called the "Independent Equity Committee."  (Id. at 12.) Plaintiffs and the Independent Equity Committee allegedly worked for months reviewing salary and performance information concerning Hispanic faculty and prepared a Hispanic Equity Report ("HER"), completed on or about October 8, 2019.  (Id.)  The HER allegedly found ongoing disparities against Hispanic employees, including pay deficits averaging $10,647 and $18,930 for Hispanic Associate and Assistant Professors, respectively, across UT Austin.  (Id.)  The HER was conveyed to UT Austin's top administrators, including the President, Provost, and Deans.  (Id.)

While speaking at a Faculty Council meeting on or about November 11, 2019, UT's President at that time, Gregory Fenves, allegedly acknowledged that disparities affecting Hispanics existed and recognized the need to address such disparities, just as UT had done for female professors and Black professors.  (Id. at

14.)  Consequently, in the Spring of 2020, UT Provost McInnis allocated $3 million for "Equity Raises."  (<u>Id.</u> at 15.)  However, according to Plaintiffs, the majority of those pay raises did not go to Hispanic faculty members, contrary to the disparate compensation deficits that the HER and other analyses had demonstrated to the Provost's office.  (<u>Id.</u>)  During this time, both President Fenves and Provost McInnis left UT for positions at other universities before the planned recurring salary funds were fully allocated.  (<u>Id.</u>)  In or about July 2020, Defendant Hartzell was appointed UT Interim President.  (<u>Id.</u>)

In summer 2020, while working on the Executive Committee of UT's Faculty Council, Martinez was the principal author of a committee report submitted to President Hartzell on July 27, 2020.  (<u>Id.</u>)  The report requested funding for UT's academic programs in American ethnic studies, because of recent cutbacks.  (<u>Id.</u>)  However, nothing was done to rectify the issues presented to President Hartzell.  (<u>Id.</u> at 16.)

On or about August 3, 2020, the Committee allegedly sent a formal communication on Hispanic pay discrimination to President Hartzell and to Interim Provost Daniel Jaffe, to which neither responded.  (<u>Id.</u>)  Because of Defendants' failure to respond or to address the disparity issues raised regarding Hispanic faculty, Martinez filed a complaint of discrimination with the Department of Labor ("DOL"), on or about October 14, 2020.  (<u>Id.</u>)  Plaintiffs allege they both engaged

in the protected activities of investigating and opposing the pay disparities of Hispanic faculty across the University on uncompensated committees from in or about 2018 to 2020.  (Id.)

In or about November 2020, after Plaintiffs and the Independent Equity Review Committee notified Hartzell and interim Provost Jaffe of discrimination towards Hispanic faculty, Jaffe created another committee called the Equity Review Process Consultative Committee ("ERPCC").  (Id.)  The ERPCC's purpose was to assess salary equity among professors and to work with an outside contractor, hired by Hartzell, that would analyze salary inequities.  (Id.) Martinez was appointed to this committee as well.  (Id. at 17.)

Meanwhile, between the latter part of October 2020 and the early part of 2021, nine Hispanic professors, including Zamora and Martinez, filed complaints of discrimination with the DOL.  (Id.)  In or about February 2021, prior to the outside contractor performing any substantive work, and without any report being prepared by the contractor or the ERPCC, President Hartzell allegedly cancelled the contractor's work and disbanded the ERPCC.  (Id.)

In or about 2020, UT's Hispanic Faculty and Staff Association ("HFSA"), created a committee to analyze the salaries of staff.  (Id.)  In their formal report, completed on or about November 1, 2021, the HFSA also found that in many UT staff jobs Hispanic employees were also paid less than non-Hispanic

White employees at UT Austin.  (Id.)  Plaintiffs allege UT Austin and Hartzell

took no remedial action after being presented with HFSA's information.

On October 15, 2020, Martinez filed a discrimination complaint with

the United States Department of Labor's Office of Federal Contract Compliance

Programs.  (Id. at 45–59.)  On January 2, 2021, Zamora filed his respective

complaint (collectively, the "OFCCP charges").  (Id. at 60–65.)

After Martinez and Zamora allegedly opposed Hispanic

discrimination, UT Austin increased both of their salaries, but "not enough to

eliminate the disparities with comparable non-Hispanic Professors."  (Id. at 19.)  In

addition, Zamora was recognized with an Endowed Chair position in 2022; but

according to Plaintiffs "the disparities still persist."  (Id.)

On December 28, 2023, Plaintiffs filed the instant lawsuit against

Defendants.  (Dkt. # 1.)  On March 8, 2024, Plaintiffs amended the complaint.

(Dkt. # 12.)  Plaintiffs bring suit under Title VII of the Civil Rights Act and 24

U.S.C. §§ 1981, 1983 for disparate treatment and disparate impact claims of

discrimination and claims of retaliation.  (Dkt. # 12 at 1.)

Plaintiffs seek damages in the form of lost compensation, benefits,

appointments, and promotions, or the equitable compensation equivalents during

the entire actionable period in the past and through to a reasonable period of time

into the future.  (Id. at 3.)  On April 12, 2024, Defendants filed their Motion to

Dismiss and to Strike Class Allegations.  (Dkt. # 17.)  On May 10, 2024, Plaintiffs also filed a Motion to Strike.  (Dkt. # 20).  On July 2, 2024, Plaintiffs filed a Motion for Leave to File Sur-Reply in Opposition to Defendants' Motion to Dismiss.  (Dkt. # 29.)

LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  In analyzing a motion to dismiss for failure to state a claim, the court "accept[s] 'all well pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"  United States ex rel. Vavra v. Kellogg Brown & Root, Inc., 727 F.3d 343, 346 (5th Cir. 2013) (quoting In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007)).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  Id.  Thus, although all reasonable inferences will be resolved in favor of the

8

plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1067 (5th Cir. 1994); see also Plotkin v. IP Axess Inc., 407 F.3d 690, 696 (5th Cir. 2005) ("We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").

DISCUSSION

The Court first addresses Plaintiffs' Motion to Strike (Dkt. # 20) and Motion to File Sur-Reply (Dkt. # 29) before turning to Defendants' Motion to Dismiss and to Strike the Class Allegations (Dkt. #17.)

I.    MOTION TO STRIKE

Federal Rule of Civil Procedure 12(f) allows the court to strike an "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  Granting a motion to strike may "streamline the pleadings and the litigation and [ ] avoid unnecessary inquiry into immaterial matters." Baytown Christian Fellowship Church v. Underwriters at Lloyds, London, No. H–10–5173, 2012 WL 3129094, at *1 (S.D. Tex. July 31, 2012) (internal quotations omitted).  Motions to strike are generally disfavored.  Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1058 (5th Cir. 1982); SEC v. Cuban, 798 F.Supp.2d 783, 787 (N.D. Tex. 2011). The Court has broad discretion to determine whether the challenged matter should be stricken.  Id.

9

Plaintiffs contend that Defendants' motion to dismiss refers to and attaches a document to the motion (Dkt. # 17, Ex. 9) that is not referred to in the First Amended Complaint.  (Dkt. # 20 at 1.)  Plaintiffs argue this document could not form a basis for Plaintiffs' claims given that it was created after and pertains to a time period after a majority of Plaintiffs' claims accrued and is therefore not properly before this Court as part of the motion to dismiss.  (Id.)

The document at issue is the "2023-24 Guidelines for Annual Review of Faculty," attached to Defendants' motion as Exhibit 9.  (See Dkt. # 17, Ex. 9.) Defendants respond that Exhibit 9 is publicly available on UT Austin's website, and therefore, this Court may take judicial notice of it.  (Dkt. # 26 at 1.)  Moreover, Defendants explain the Guidelines do not conflict with Plaintiffs' allegations or claims, and merely provide context for the other policies referenced in Plaintiffs' amended complaint.  (Id. at 2.)

The Court finds Exhibit 9 is not "redundant, immaterial, impertinent, or scandalous matter" that warrants being stricken from the briefing.  Accordingly, the Court **DENIES** Plaintiffs' motion to strike.

## II.    MOTION FOR LEAVE TO FILE SURREPLY

The Court next addresses Plaintiffs' motion for leave to file a sur-reply in opposition to Defendants' motion to dismiss.  The Court does not permit sur-replies to be filed as a matter of right.  Indeed, sur-replies "often amount to

little more than a strategic effort by the nonmovant to have the last word on a matter." Silo Restaurant, Inc. v. Allied Property and Cas. Ins. Co., 420 F. Supp. 3d 562, 570 (W.D. Tex. 2019) (internal quotation omitted).

"Although surreplies 'are heavily disfavored,' it is within the sound discretion of the courts to grant or deny leave to file such additional briefing." Id. (quoting Warrior Energy Servs. Corp. v. ATP Titan M/V, 551 F. App'x 749, 751 n.2 (5th Cir. 2014)). But because "[a]rguments raised for the first time in a reply brief are generally waived," sur-replies are usually unnecessary. Jones v. Cain, 600 F.3d 527, 541 (5th Cir. 2010). Sur-replies have, however, been useful briefing for courts when necessary to respond to the movant using the reply to: "(1) introduce new evidence; (2) assert a new defense to liability; or (3) cite a supposedly analogous case for the first time." Austin v. Kroger Texas, L.P., Case No. 3:11-cv-1169-B, 2016 WL 1322248, at *1 (N.D. Tex. 2016) (omitting internal citations).

Plaintiffs argue that they should be permitted to file a sur-reply regarding Defendants' reply in support of its motion to dismiss (Dkt. # 28) to "respond to factual misstatements and incorrect characterizations of law raised, many for the first time, in Defendant's Reply." (Dkt. # 29 at 1.) Upon review, the arguments that Plaintiffs address in their proposed sur-reply are not in response to "new arguments" raised by Defendants in its reply. Because Defendants raised the

challenged issues in its motion to dismiss, Plaintiffs already had an opportunity to respond to them in their Response.

The Court finds no reason to grant Plaintiffs another chance to elaborate on arguments that could have—and in some cases were—discussed in their Response.  If the Court were to permit such additional briefing, it would simply be indulging Plaintiff's "strategic efforts . . . to have the last word on a matter."  Silo Restaurant, 420 F. Supp. 3d at 571.  Accordingly, the Court **DENIES** Plaintiffs' motion for leave to file a sur-reply.[1]

III.    MOTION TO DISMISS AND STRIKE CLASS ALLEGATIONS

Defendants move to dismiss Plaintiffs' individual claims and to strike the class action claims.  (Dkt. # 17.)  First, Defendants argue Plaintiffs did not allege plausible disparate impact claims.  (Id. at 19.)  Second, Defendants argue Plaintiffs' disparate treatment claims are not viable.  (Id. at 22.)  Third, Defendants argue Plaintiffs' retaliation claims fail for lack of causation and for failure to exhaust administrative remedies.  (Id. at 32–33.)  Next, Defendants argue, in addition to being inadequately pled, Plaintiffs' § 1983 claims against President Hartzell fail on qualified immunity grounds.  (Id. at 35.)  Finally, Defendants argue Plaintiffs' class-based claims are barred for lack of Rule 23(a) commonality and

---

[1] The Court also notes that it held oral arguments in this matter and the parties had an ample opportunity to address any issues not covered in briefings.

failure to satisfy Rule 23(b) requirements.  (Id. at 39.)  The Court addresses each argument in turn.

A.    Disparate Impact under Title VII

Defendants argue Plaintiffs did not allege plausible disparate impact claims as Plaintiffs did not identify a "specific, facially neutral policy" in their complaint.  (Dkt. # 17 at 19.)  "To establish a prima facie case of discrimination under a disparate-impact theory, a plaintiff must show: (1) an identifiable, facially neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two."  McClain v. Lufkin Indus., Inc., 519 F.3d 264, 275 (5th Cir. 2008).  The Supreme Court has recognized that the plaintiff's burden in establishing a prima facie case goes beyond the need to merely show that there are statistical disparities in the employer's work force.  Watson v. Fort Worth Bank & Tr., 487 U.S. 977, 994 (1988).  The plaintiff must begin by identifying the specific employment practice that is challenged.  Id.  The Watson Court also recognized that a disparate impact analysis may in principle be applied to subjective as well as to objective employment practices.  Id. at 991.

i.    Policy

The Court first looks to whether Plaintiffs have sufficiently pled an identifiable, facially neutral employment practice or policy that is challenged.  McClain, 519 F.3d at 275.  Plaintiffs allege that the specific facially neutral

policies that resulted in the disparities include the following: (1) Regents Rules and
Regulations Rule 30501 regarding "Employee Evaluations"; (2) Regents Rule
31102 regarding "Evaluation of Tenured Faculty"; (3) UT Austin's Rule 2-2160 in
the "Handbook of Operating Procedures" ("HOP") regarding faculty performance
reviews and setting of salaries and promotion; (4) Regents Rule 60202, which
provides that UT's "president is responsible for maintaining oversight of
Endowments established to support faculty positions, including assignment of
holders and use of distributions, but may delegate this authority"; and (5) HOP 2-
2440, which provides that selection criteria for endowed chairs and professorships
shall generally be based on a "record of excellence," although there are no specific
requirements or guidelines.  (Dkt. # 12 at 6–8.)

   While Defendants recognize that Plaintiffs cited specific policies from
UT Austin and its Board of Regents, Defendants contend the challenged policies
are too broad and vague to qualify as a "specific, facially neutral policy."  (Dkt.
# 17 at 20.)  Defendants group the policies together to claim that Plaintiffs attempt
to "broadly target the 'cumulative effects' of allegedly biased, subjective decision-
making."  (Id.)  Defendants point to Plaintiffs' OFCCP charges, attached to the
Amended Complaint, in which Plaintiffs claimed "[t]hroughout the years, the sum
of such acts creates a cumulative effect of discrimination against Hispanic
employees…"  (Dkt. # 12 at Ex. A, B.)

In <u>Anderson v. Douglas & Lomason Co., Inc.</u>, the Fifth Circuit held that the district court did not err in failing to analyze plaintiffs' claims using a disparate impact model where the "the plaintiffs merely launched a wide-ranging attack on the cumulative effects of [the employer's] employment practices." 26 F.3d 1277, 1284 (5th Cir. 1994). However, in <u>Anderson</u>, the plaintiffs failed to identify a specific aspect of subjective decision making by its employer that was shown to have a causal connection to the class-based imbalance. <u>Id.</u> Instead, the only policy pointed to was that the employers were required to fill out applications to be considered for the general or supervisory work force. <u>Id.</u>

At this stage of the proceeding, Plaintiffs have sufficiently identified subjective decision-making policies and rules used in UT Austin's employment decisions to state a disparate impact claim. Plaintiffs allege that the identified rules and policies establish there are no binding requirements for salary, promotion, and appointment decisions, which allows for "manipulation of the rules, subjective decisions, and discriminatory bias in these decisions." (Dkt. # 12 at 9.) The Court finds that the identifiable, facially neutral decision policies are not too vague to be deemed "an attack on the cumulative effects" of UT Austin's alleged discriminatory employment practices.

ii.    <u>Statistical Disparities</u>

Plaintiffs also contend they have pled compelling facts showing significant statistical disparities between Hispanic and non-Hispanic faculty members.  (Dkt. # 23 at 16.)  As reported in the HER, presented to "UT's top administrators, including the President, Provost, and Deans," Plaintiffs identified the following disparities:

- In 2016-17, each of the 47 fulltime Hispanic full Professors at the University of Texas were paid a mean annual compensation of $25,342 less than the 758 White fulltime full Professors (over 13% deficit);
- Pay deficits averaging $10,647 and $18,930 for Hispanic Associate and Assistant Professors, respectively, across UT;
- UT had never appointed a Hispanic person to a compensated position of leadership in the History Department;
- In 2019, UT had appointed or promoted 130 persons to university positions of Dean, Vice Dean, Associate Dean, and Assistant Dean, that is, all serving in 2019. Of those, UT had appointed or promoted only 10 Hispanics into those positions, that is only 7.7 % and none were awarded to Hispanic females;
- Of the approximately 250 administrators in the leadership of the university's schools, including the offices of the President, Provost, and Directors, but excluding Department Chairs, UT had appointed or promoted only 14 Hispanics by 2019, which amounted to only 6%, and these were mostly in the lower positions; and
- In 2018, UT had appointed or promoted 539 faculty members with endowed Chairs and Professorships. Of those 539, only 18 were Hispanic, which was only 3.3 % of the total.

(Dkt. # 12 at 12–13.)  Plaintiffs also allege UT Austin's own statistical analysis, conducted between 2009-2018, showed 12 percent difference between the salaries of Hispanic versus non-Hispanic full professors.  (<u>Id.</u> at 13.)  Indeed, Defendants

16

do not raise arguments in their motion regarding this element.  Accordingly, the Court finds Plaintiffs have plausibly alleged their disparate impact claims under Title VII.  The Court **DENIES** Defendants' motion to dismiss the disparate impact claims.

      B.    Disparate Treatment under Title VII

        "Disparate-treatment discrimination addresses employment actions that treat an employee worse than others based on the employee's race, color, religion, sex, or national origin.  In such disparate-treatment cases, proof and finding of discriminatory motive is required."  Cicalese v. Univ. of Tex. Med. Branch, 924 F.3d 762, 766 (5th Cir. 2019) (quoting Pacheco v. Mineta, 448 F.3d 783, 787 (5th Cir. 2006)).

        In order to survive a motion to dismiss, "a plaintiff need not make out a prima facie case under McDonnell Douglas."  Cicalese, 924 F.3d at 766 (quoting Raj v. La. State Univ., 714 F.3d 322, 331 (5th Cir. 2013)).  But a plaintiff must "plead sufficient facts on all of the ultimate elements of a disparate treatment claim to make their case plausible."  Id.  (quoting Chhim v. Univ. of Tex. at Austin, 836 F.3d 467, 470 (5th Cir. 2016)).  "[T]here are two ultimate elements a plaintiff must plead to support a disparate treatment claim under Title VII: (1) an adverse employment action, (2) taken against a plaintiff because of [his] protected status."  Id. at 767.  To establish these elements, plaintiff must allege sufficient facts to

"nudge [his] claims across the line from conceivable to plausible." Id. (quoting Twombly, 550 U.S. at 547).

When a plaintiff's disparate treatment claim "depends on circumstantial evidence, [he] will ultimately have to show that [he] can satisfy the McDonnell Douglas framework." Cicalese, 924 F.3d at 767. Accordingly, "it can be helpful to reference that framework when the court is determining whether a plaintiff has plausibly alleged the ultimate elements of the disparate treatment claim." Id. The Fifth Circuit has stressed that the district court "inappropriately heightens the pleading standard by subjecting a plaintiff's allegations to rigorous factual or evidentiary analysis under the McDonnell Douglas framework in response to a motion to dismiss." Id. At the motion to dismiss phase, the plaintiff "need only plausibly allege facts going to the ultimate elements of the claim." Id.

Defendants argue that Plaintiffs' disparate treatment claim is one of unintentional discrimination, which is not cognizable under a disparate treatment theory. (Dkt. # 17 at 23.) In addition, Defendants argue the disparate treatment claim is not viable as Plaintiffs pled no meaningful facts on intentional discrimination. (Id.) The focus of the disparate treatment claims appears to be on whether Plaintiffs' assertions are based on UT Austin decision-makers being affected by "Hispanopia", which is a term Plaintiffs used to refer to "unintentional bias against Hispanics." Plaintiffs respond that this concept is only identified in

the HER—not contained within the allegations in the Amended Complaint itself. (Dkt. # 23 at 7.)  The Court agrees with Defendants that it may rely on Plaintiffs' assertion that the employment disparities are a result of unintentional discrimination, as the HER was attached to and referenced the Amended Complaint.  The Court nonetheless agrees with Plaintiffs, however, that their disparate treatment allegations rely upon intentional discrimination by Defendants.

In <u>Cicalese v. Univ. of Texas Med. Branch</u>, the Fifth Circuit concluded that professors alleged sufficient facts to assert a disparate treatment claim by claiming their employer's various actions against them were motivated by anti-Italian bias.  924 F.3d 762, 768 (5th Cir. 2019).  There, the professors alleged that their employers made specific derogatory remarks regarding their race or national origin.  <u>Id.</u> at 764.  Thus, taking all the evidence together, the plaintiffs' disparate treatment claim withstood a motion to dismiss because they had alleged sufficient facts that went "to the ultimate elements of the claim."  <u>Id.</u> at 768.  The Court turns to whether Plaintiffs sufficiently alleged facts to support their claim.

       i.    <u>Pay-Based Claims</u>

Defendants argue that Plaintiffs' vague disparate pay allegations are inadequately pled.  (Dkt. # 12 at 24.)  In the Amended Complaint, Plaintiffs allege UT Austin paid a higher salary "to at least three specific, identified peers, even though Martinez has more publications/a better publication record, taught more

courses at UT, and has more time in rank as a full Professor." (Dkt. # 19 at 78.) The Court agrees with Plaintiffs that it need not identify the "three specific, identified peers" by name. The Fifth Circuit has also rejected that plaintiffs be required to allege they were treated differently by their employer under "*nearly identical* circumstances." <u>Cicalese</u>, 924 F.3d at 767. (emphasis added).

The Court finds Plaintiffs sufficiently alleged similar non-Hispanic employees were treated more favorably in their pay-based claims. Moreover, Plaintiffs provide additional facts suggesting anti-Hispanic animus. For example, Plaintiffs alleged that in February 2021, President Hartzell disbanded the ERPCC, which was meant to assess salary equity among professors and to work with an outside contractor, hired by Hartzell, that would analyze salary inequities. (Dkt. #12 at 16–17.) President Hartzell allegedly disbanded this committee shortly after nine Hispanic professors, including Plaintiffs, filed their OFCCP charges with the DOL. (<u>Id.</u> at 16.) Thus, Plaintiff's allegations raise the plausible inference that Defendants paid Plaintiffs differently because they are Hispanic.

  ii.  <u>Promotion-Based Claims</u>

To prevail on a failure to promote claim, a plaintiff must ultimately show that "(1) he belongs to a protected class; (2) he applied for and was qualified for a position for which applicants were being sought; (3) he was rejected; and (4) a person outside of his protected class was hired for the position." <u>Burrell v. Dr.</u>

Pepper/Seven Up Bottling Grp., Inc., 482 F.3d 408, 412 (5th Cir. 2007).  While

Plaintiffs need not establish or explicitly plead each element, they must at least

plead facts giving rise to a reasonable inference of plausibility for the ultimate

elements of the claim.  See Chhim, 836 F.3d at 470–71.

> Here, Zamora did not allege he applied for a leadership position or

that he wanted to apply but was otherwise deterred from doing so.  However,

Martinez did allege that he applied to Department Chair and Assistant Chair

positions between 2019 through 2023 and was denied.  (Dkt. # 12 at 21–24.)

Defendants argue that Martinez's claims are still inadequately plead because

Martinez did not allege who the decision-makers were, why he believes the

decision markers harbored discriminatory animus against Hispanics or any

meaningful facts regarding the other selected candidates.  (Dkt. # 17 at 30.)

> The Court finds that Plaintiffs have alleged enough facts that go to the

"ultimate question" of whether Defendants did not promote Plaintiffs because of

their race and national origin.  See Chhim, 836 F.3d at 471.  For instance, Plaintiffs

allege they were more qualified for the History Department Associate Chair

position available in 2020 as they had a longer record of employment at UT, had

more years in rank as full professors, had taught more courses and had more

publications and/or a better publication record using metrics created and used

annually by the History Department in evaluations for raises.  (Dkt. # 12 at 23.)  In

addition, Plaintiffs alleged that certain comparators were selected as Chair or Interim Chair of the History Department without interviewing or communicating with the applicants.  (Id. at 24.)  Plaintiffs allege these selections "demonstrate that Regents Policy UTS 187, a facially neutral policy, when applied by the History Department resulted in discriminatory outcomes each time of promoting non-Hispanics when the Hispanic candidates had applied and were more qualified for the position."  (Id.)

Because a plaintiff need only plausibly allege facts going to the ultimate elements of the claim to survive a motion to dismiss, the Court finds Plaintiffs have sufficiently plead disparate treatment claim.  Cicalese, 924 F.3d at 768.  Therefore, the Court **DENIES** Defendants' motion to dismiss the disparate treatment claims.

### C.    Retaliation Claims Under Title VII

Defendants argue Plaintiffs' retaliation claims fail for lack of causation and are not viable as the alleged adverse actions occurred both before and after Plaintiffs' discrimination complaints and there is no temporal proximity. (Dkt. # 17 at 31–32.)  Defendants also argue Plaintiffs did not assert retaliation claims in their OFCCP charges and, therefore, their retaliation claims are barred by the principle that a plaintiff generally cannot base a Title VII claim on an action that was not asserted in a charge of discrimination.  (Id. at 33.)

"Title VII prohibits retaliation against employees who engage in protected conduct, such as filing a complaint of discrimination." Perez v. Region 20 Educ. Serv. Ctr., 307 F.3d 318, 325 (5th Cir. 2002); see also 42 U.S.C. § 2000e-3. To establish a prima facie case of retaliation, a plaintiff must establish that "(1) she participated in an activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the materially adverse action." Aryain v. Wal–Mart Stores Tex. LP, 534 F.3d 473, 484 (5th Cir. 2008).

Under the McDonnell Douglas burden-shifting framework, Plaintiff must first establish a prima facie case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If Plaintiff is successful, "then the defendant must articulate a legitimate, nondiscriminatory reason for its actions." Burns v. Nielsen, 456 F. Supp. 3d 807, 824 (W.D. Tex. 2020). "Finally, the burden shifts back to the plaintiff to show that [the defendant's] proffered reason is [a] pretext for discrimination." Id.

However, the Court again notes that "the McDonnell Douglas standard also does not govern retaliation claims at the motion-to-dismiss stage." Scott v. U.S. Bank Nat'l Ass'n, 16 F.4th 1204, 1210 (5th Cir. 2021). That is because "[t]he prima facie case under McDonnell Douglas . . . is an evidentiary standard, not a pleading requirement." Swierkiewicz v. Sorema N.A., 534 U.S.

23

506, 510 (2002).  But a plaintiff is still required "to plead sufficient facts on *all of the ultimate elements*" of her retaliation claim.  Chhim, 836 F.3d 467, 470 (5th Cir. 2016) (emphasis added).  Again, "a district court may find it helpful to reference McDonnell Douglas" on a motion to dismiss.  Norsworthy v. Houston Indep. Sch. Dist., 70 F.4th 332, 336 (5th Cir. 2023).

Here, Plaintiffs argue they have stated a claim for retaliatory discharge under Title VII by alleging sufficient facts to support the Court's reasonable inference that (1) they engaged in protected activity, (2) an adverse employment action occurred, and (3) there was a causal link between the two.  See Raggs v. Miss. Power & Light Co., 278 F.3d 463, 471 (5th Cir. 2002).

First, Plaintiffs pled sufficient facts that allow the Court to reasonably infer they engaged in protected activity under Title VII.  A plaintiff engages in "protected activity" when he opposes or informs his employer of an unlawful employment practice under Title VII.  See 42 U.S.C. § 2000e–3; Douglas v. DynMcDermott Petroleum Operations Co., 144 F.3d 364, 372 (5th Cir. 1998). Plaintiffs allege that, on at least four occasions between July 27, 2020, through November 1, 2021, they reported to UT Austin's top administrators that Hispanic faculty had been experiencing disparate treatment on the basis of their race through the form of various committee reports.  (Dkt. # 12 at 12–17.)  Moreover, Plaintiffs engaged in protected activity by filing their OFCCP charges on October 15, 2020,

and January 7, 2021.  (Id. at 45–65.)  The Court finds Plaintiffs sufficiently alleged

protected activity.  See E.E.O.C. v. Rite Way Serv., Inc., 819 F.3d 235, 240 (5th

Cir. 2016) (finding that internally complaining about an employment practice may

constitute protected activity, so long as the complainant "reasonably believed the

employment practice to be unlawful.")

As for the second element, it appears that Defendants do not argue

that Plaintiffs failed to sufficiently allege adverse action.  For instance, Defendants

recognize the adverse acts include, as alleged, "Martinez not receiving an equity

raise in late 2022 or not being appointed Department Chair in June 2022."  (Dkt.

# 17 at 32.)  Instead, Defendants focus on whether Plaintiffs' claims fail on

causation grounds.  The Court therefore turns to those arguments.

i.    Causation

In retaliation claims under Title VII, a causal link can be established

"when the evidence demonstrates that the employer's adverse employment

decision was based in part on knowledge of the employee's protected activity."

Smith v. Potter, No. 3:07-CV-1509-P, 2008 WL 11347431, at *3 (N.D. Tex. Aug.

21, 2008).  "The causal link required by the third prong of the prima facie case

does not rise to the level of a 'but for' standard."  Gee v. Principi, 289 F.3d 342,

345 (5th Cir. 2002).  "Instead, at the prima facie case stage, a plaintiff can meet his

burden of causation by showing close enough timing between his protected activity

and his adverse employment action." Brown v. Wal-Mart Stores E., L.P., 969 F.3d 571, 577 (5th Cir. 2020) (cleaned up) (citation omitted); see Manning v. Chevron Chem. Co., 332 F.3d 874, 883 (5th Cir. 2003) ("To establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity"); see also Chaney v. New Orleans Pub. Facility Mgmt., Inc., 179 F.3d 164, 168 (5th Cir. 1999) ("If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct"); Quamar v. Houston Hous. Auth., No. 4:23-CV-00814, 2024 WL 2055008, at *6 (S.D. Tex. May 8, 2024) (holding that there is no causal connection "when the adverse employment action complained of precedes the protected activity"); Hamilton v. DeJoy, No. 1:23-CV-01045, 2024 WL 3540474, at *5 (W.D. Tex. July 16, 2024).

Defendants argue Plaintiffs cannot show causation via temporal proximity as temporal proximity generally runs from the first, and not last, protected act. (Dkt. # 17 at 32.) Defendants state Plaintiffs' first discrimination complaint was on May 2, 2018. Thus, the alleged adverse acts, such as Martinez not receiving an equity raise in late 2022 or not being appointed Department Chair in June 2022, is too significant of a temporal gap. (Id.)

The Fifth Circuit has made clear that in measuring temporal proximity, only the first instance of protected activity is relevant.  Decou-Snowton v. Jefferson Par., No. 24-30079, 2024 WL 4879466, at *7 (5th Cir. Nov. 25, 2024); see also Perkins v. Child Care Assocs., 751 F. App'x 469, 474 (5th Cir. 2018) ("[P]laintiffs 'cannot, with each protected activity, re-start the temporal-proximity clock' by alleging that an employer 'repeatedly engaged in protected activity' over a period of time." (quoting Alkhawaldeh v. Dow Chem. Co., 851 F.3d 422, 428 n.23 (5th Cir. 2017)).  Plaintiffs allege that on May 2, 2018, Martinez, Zamora, and other Hispanic professors went before the History Department's faculty and supervisor with their concerns regarding the disparity in Hispanic faculty being paid less and receiving fewer promotions and appointments than non-Hispanic faculty.  (Dkt. # 12 at 10.)  Plaintiffs also generally allege that their "protected activity was known by Hartzell, including communications in writing via reports and emails since 2019, and verbally in meetings with multiple UT administrators and Hartzell."  (Id. at 41.)

The first instance where a specific adverse action is alleged within a closer time frame to May 2018 includes when Martinez applied for the position of Chair of the History Department in March 2020 and was denied the position.  (Dkt. # 12 at 22.)  Plaintiffs further recognize that their adverse actions allegations also

include generalized assertions that Defendants refused to pay, promote, or grant an endowment throughout 2019 through 2023.

The Court finds that Plaintiffs have not sufficiently alleged temporal proximity between their first instance of protected activity in May 2018 and the alleged adverse acts.  While actions taken over a long period of time may ultimately, in the aggregate, constitute racial discrimination, that is not the case with a discrete act of retaliation.  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002); see also Hamic v. Harris Cnty. W.C. & I.D. No. 36, 184 F. App'x 442, 447 (5th Cir. 2006) ("[R]etaliation is, by definition, a discrete act, not a pattern of behavior.").  Accordingly, Plaintiffs have failed to allege a causal link as required for their retaliation claims.

Therefore, the Court **GRANTS WITHOUT PREJUDICE** Defendants' motion to dismiss Plaintiffs'' retaliation claims.  Because the Court dismisses Plaintiffs' retaliation claims, it need not address Defendants' argument that Plaintiffs did not properly exhaust their administrative remedies.  (See Dkt. # 17 at 33.)

D.    Section 1983 Claims

Plaintiffs seek relief for the actions of Defendant Hartzell, in his official[2] and individual capacity, under 42 U.S.C. §1981, with the action brought through 42 U.S.C. § 1983.  (Dkt. # 12 at 1, 34.)

The Fifth Circuit has analogized § 1983 discrimination claims made against public employees to similar claims made under Title VII.  See Lauderdale v. Tex. Dep't. of Criminal Justice, 512 F.3d 157, 166 (5th Cir. 2007).  The Fifth Circuit, in so doing, stated that invidious discriminatory intent can be shown in the same way under § 1983 as under Title VII—by either direct or circumstantial evidence.  See Lee v. Conecuh Cty. Bd. of Ed., 634 F.2d 959, 961–62 (5th Cir. 1981); Giles v. City of Dallas, 539 F. App'x 537, 543 (5th Cir. 2013) (per curiam). However, Title VII and § 1983 are different in at least one important way.  See, e.g., Sims v. City of Madisonville, 894 F.3d 632, 640–41 (5th Cir. 2018) (per curiam).  Importantly, "[u]nlike Title VII, § 1983 applies to individuals." Id. at 640. "And since § 1983 applies to individuals, [the Court] must be keenly aware of what § 1983 requires before plaintiffs can seek relief from individuals—namely

---

[2] The Court and parties agree that Plaintiffs may not bring a § 1983 claim against President Hartzell in his official capacity.  See Hafer v. Melo, 502 U.S. 21, 25 (1991) (holding that "[s]uits against state official in their official capacity therefore should be treated as suits against the State.")).  Therefore, for clarification purposes, the Court **DISMISSES** any claims against Defendant Hartzell in his official capacity.

individual causation." Jones v. Hosemann, 812 F. App'x 235, 238 (5th Cir. June 15, 2020).

In a § 1983 claim, the Supreme Court instructs that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676; see Id. at 683 (holding that defendants cannot be held liable "unless they themselves acted on account of a constitutionally protected characteristic"). Only when those individual actions "proximately cause[ ]" the plaintiff's injury can that plaintiff seek relief under Section 1983. County of Los Angeles v. Mendez, 581 U.S. 420, 430 (2017) (citing Heck v. Humphrey, 512 U.S. 477, 483 (1994)); see also Sims, 894 F.3d at 639 (noting that "individual liability for a government official who violates constitutional rights . . . turns on traditional tort principles of 'but-for' causation").

The Fifth Circuit has noted that "[r]equiring a plaintiff to plead individual causation in § 1983 suits makes sense," Hosemann, 812 F. App'x at 239–40, explaining that, "§ 1983 create[d] a species of tort liability," Heck, 512 U.S. at 483 (quoting Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 305 (1986)), "and the Supreme Court routinely looks to "the common law of torts," Id., to "determine the elements of, and rules associated with, an action seeking damages for [a constitutional] violation." Manuel v. City of Joliet, 580 U.S. 357,

370 (2017).  "And it goes without saying that a fundamental element of common-law torts is causation."  Hosemann, 812 F. App'x 239 (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 346 (2013) ("Causation in fact—i.e., proof that the defendant's conduct did in fact cause the plaintiff's injury—is a standard requirement of any tort claim.")).  "It is not enough for a plaintiff to simply allege that something unconstitutional happened to him."  Id. at 239–40. "The plaintiff must plead that each defendant individually engaged in actions that caused the unconstitutional harm."  Id.

        "Thus, while the prima facie elements of a Title VII claim may establish an employer's liability for intentional discrimination, a § 1983 plaintiff must additionally plead and prove which actions of the individual defendant caused the harm."  Id. at 40 (citing Sims, 894 F.3d at 641 ("That individual liability turns on traditional tort principles of whether the particular act was a 'causal link' in the termination.")); cf. Iqbal, 556 U.S. at 676 ("[Plaintiffs] must plead and prove that the defendant[s] acted with discriminatory purpose." (emphasis added)); Lee, 634 F.2d at 960 ("[Plaintiff] alleges that defendants Conecuh County Board of Education, its members, and the Superintendent of Schools . . . repeatedly fail[ed] to promote him to a principalship because of his race.").

Defendants argue that Plaintiffs' § 1983 claims are inadequately pled, barred by qualified immunity, and are limited by the applicable statute of limitations.  (Dkt. # 17 at 35.)  The Court addresses each argument in turn.

i.      Adequately pled

Defendants contend that for claims or discrimination or retaliation, a §1983 plaintiff must plead and prove that a specific, individual defendant acted with discriminatory or retaliatory purpose.  (Dkt. # 17 at 36.)  Defendants argue that Plaintiffs admit their alleged disparities accrued prior to President Hartzell's appointment in June 2020 and that Plaintiffs did not plausibly show that President Hartzell harbored discriminatory and retaliatory animus.  (Id.)

Plaintiffs argue they have pled instances of discriminatory animus under Hartzell's direction through allegations of Hartzell publicly reversing former President Fenves's position on addressing the disparities affecting Hispanics (Dkt. # 12 at 14), stopping his responses to Plaintiffs' discrimination complaints (Id. at 30), and failing to take actions to investigate and remediate the disparities experienced by Hispanic faculty relating to compensation, promotions, and appointments.  (Id. at 16.)  Thus, at this stage of the proceeding, the Court finds Plaintiffs have plausibly alleged enough facts to draw a reasonable inference that President Hartzell held discriminatory and retaliatory animus towards them.

For the reasons discussed above in its Title VII analysis, the Court concludes Plaintiffs have adequately alleged disparate impact and treatment claims for § 1983 purposes.

ii.    Qualified Immunity for Claims Against Hartzell

Defendants argue qualified immunity applies to Plaintiffs' § 1983 claims against President Hartzell in his individual capacity.  (Dkt. # 17 at 35.) "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted); see also City of Tahlequah v. Bond, 595 U.S. 9, 12 (2021) (per curiam).  It protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see also City of Tahlequah, 595 U.S. at 12.

When considering a qualified immunity defense raised in the context of a Rule 12(b)(6) motion to dismiss, the Court must determine whether "the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity." Backe v. LeBlanc, 691 F.3d 645, 648 (5th Cir. 2012) (quoting Wicks v. Miss. State Emp't Servs., 41 F.3d 991, 994 (5th Cir. 1995)).  "Thus, a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable

33

for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." Backe, 691 F.3d at 648.  Although the plaintiff bears the burden of negating qualified immunity, all inferences are drawn in his favor. Brown v. Callahan, 623 F.3d 249, 253 (5th Cir. 2010).

A "plaintiff seeking to defeat qualified immunity must show: '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" Morgan v. Swanson, 659 F.3d 359, 371 (5th Cir. 2011) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)).  "Although the plaintiff need not identify 'a case directly on point' in order to" show the law was clearly established, "he or she must point to 'authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful.'" Buehler v. Dear, 27 F.4th 969, 981 (5th Cir. 2022) (quoting Vincent v. City of Sulphur, 805 F.3d 543, 547 (5th Cir. 2015)); see also Bailey v. Ramos, No. 23-50185, slip op. at 5 (5th Cir. Jan. 10, 2025).

The Court applies a two-step analysis to determine whether a government official performing discretionary functions is entitled to qualified immunity. Bush v. Strain, 513 F.3d 492, 500 (5th Cir. 2008).  In the first step, the Court analyzes whether the facts, taken in the light most favorable to the party asserting the injury, show that "the defendant violated the plaintiff's constitutional rights." Freeman v. Gore, 483 F.3d 404, 410 (5th Cir. 2007).  If not, then the

court's analysis must end.  Id.  Otherwise, the second step requires the court to "consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question."  Id.  The government official is still entitled to qualified immunity as long as his conduct was objectively reasonable—even if the conduct violated a clearly established right.  Davis v. McKinney, 518 F.3d 304, 317 (5th Cir. 2008) (citing Hare v. City of Corinth, 135 F.3d 320, 325 (5th Cir. 1998)).

Defendants do not appear to dispute that the Professors' rights under § 1981 and Title VII are clearly established.  In any case, the right to be free from racial discrimination and retaliation is clearly established under those statutes.  See Southard v. Texas Bd. of Crim. Just., 114 F.3d 539, 549–50 (5th Cir. 1997) ("[T]he Constitution provides a right independent of Title VII to be free from race discrimination by a public employer.").  However, Defendants argue qualified immunity protects President Hartzell as it was not clearly established that he would be considered "essentially the same" as UT Austin under the circumstances here with respect to pay, promotion, and endowment decisions.  (Dkt. # 17 at 38.)  In addition, Defendants argue that there are no alleged facts to show that President Hartzell meaningfully reviewed any salary, promotion, or endowment recommendations concerning the Plaintiffs.

In <u>Foley v. University of Houston</u>, the Fifth Circuit recognized that when an individual official exercises control over the faculty positions and titles held by the plaintiffs, then that individual may be deemed "essentially the same" as the university "for [at least] purposes of the retaliatory conduct alleged." 355 F.3d 333, 338 (5th Cir. 2003). Thus, the Court finds that for this stage of the proceeding, President Hartzell may be deemed essentially the same as UT Austin.

Plaintiffs contend that their Amended Complaint establishes that President Hartzell has clear, specific responsibilities under UT Austin's own rules relating to the disparate treatment that occurred. (Dkt. # 12 at 7–8.) Plaintiffs argue that UT Austin's rules unequivocally provide that Hartzell is personally responsible for reviewing and approving all recommendations for salary rates and promotions and is responsible for making the final evaluation and decision. (Dkt. # 23 at 41.) Nonetheless, Defendants claim this is a "rubberstamped" process. (Dkt. # 17 at 38.)

Viewed in the light most favorable to Plaintiffs, the Court finds Plaintiffs have alleged sufficient involvement by President Hartzell for § 1983 purposes. Here, Plaintiffs point to specific UT policies that require President Hartzell's review and approval for any pay, promotion, or endowment decision. (Dkt. # 12 at 6–8.) Moreover, Plaintiffs' allegations establish that President Hartzell personally received reports from Martinez and Zamora and others

36

regarding "UT Austin's discrimination against Hispanics" on more than one occasion. (Id. at 15.)  The allegations also include that Hartzell personally selected or approved the hiring of an outside contractor to study salary inequities and then cancelled that contractors work and disbanded the committee tasked with identifying and resolving the disparities.  (Id. at 17.)

Accordingly, the Court finds President Hartzell is not entitled to qualified immunity at this stage for Plaintiffs' Title VII discrimination claims.  The Court therefore **DENIES WITHOUT PREJUDICE** Defendants' motion to dismiss Plaintiffs' § 1983 claims against President Hartzell in his individual capacity.

The Court also notes that there is a significant factual dispute as to President Hartzell's involvement in and knowledge of the decisions that form the basis of this action.  This alone precludes dismissal at this point in the proceedings. See Mesa v. Prejean, 543 F.3d 264, 269 (5th Cir. 2008); Foley, 355 F.3d at 340. However, the Court invites Defendants to resubmit a motion for summary judgment on the qualified immunity issue so the Court may be permitted to analyze the facts beyond the pleadings and incorporated references.

iii.    Statute of Limitations

For purposes of this motion, the parties agree that a four-year statute of limitations applies.  Therefore, Defendants argue Plaintiffs cannot recover for

alleged unlawful acts that occurred before December 28, 2019.  (Dkt. # 17 at 38.)

Plaintiffs agree and respond that they only seek recovery for actions that occurred

within "the actionable period in this case" as determined by the appropriate statute

of limitations and this Court.  (Dkt. # 23 at 40.)  At this stage, the Court finds only

the adverse employment actions after December 28, 2019, are actionable.

      E.    <u>Class Action Claims</u>

      Defendants also move to strike Plaintiffs' proposed class action

claims.  (Dkt. # 17 at 39.)  Motions to strike class allegations at the pleading stage

should be granted only when "it is facially apparent from the pleadings that there is

no ascertainable class . . ."  <u>John v. Nat'l Sec. Fire & Cas. Co.</u>, 501 F.3d 443, 445

(5th Cir. 2007).  A defendant may move to strike such allegations prior to

discovery "in rare cases where the complaint itself demonstrates that the

requirements for maintaining a class action cannot be met."  <u>Delarue v. State Farm

Lloyds</u>, 2010 WL 11530499, at *2 (E.D. Tex. Mar. 10, 2010) (citing <u>Rios v. State

Farm Fire & Cas. Co.</u>, 469 F. Supp. 2d 727, 740 (S.D. Iowa 2007)).

      Defendants argue Plaintiffs' class claims should be struck as they are

foreclosed by <u>Wal-Mart v. Dukes</u>, 564 U.S. 338 (2011), and other binding

precedent.  (Dkt. # 17 at 39.)  In analogizing to <u>Dukes</u>, Defendants argue that the

only "policy" at issue here is one that allows discretion by local supervisors over

employment matters.  Thus, they argue there is a lack of commonality.  <u>See Dukes</u>,

564 U.S. at 342.  Second, Defendants argue Plaintiffs' class claims fail on Rule

23(b) grounds.  (Dkt. # 17 at 44.)

      i.      Rule 23(a) Commonality

Rule 23 requires that several preliminary conditions be met before a

proposed class may be certified.  Cole v. Gen. Motors Corp., 484 F.3d 717, 723

(5th Cir. 2007).  Under Rule 23(a), the plaintiff must establish numerosity,

commonality, typicality, and adequacy of class representation.  Id. (citing Fed. R.

Civ. P. 23(a)).  As relevant to this inquiry, Rule 23(a)(2) requires that there are

"questions of law or fact common to the class."  Steering Comm. v. Exxon Mobil

Corp., 461 F.3d 598, 601 (5th Cir. 2006) (internal citations omitted).  Commonality

requires the plaintiff to demonstrate that the class members have suffered the same

injury.  Dukes, 564 U.S. at 349–50.  In other words, what matters to class

certification is not raising "common questions," but rather the capacity of a class

action to generate common answers apt to drive the resolution of the litigation.  Id.

In Dukes, the Supreme Court recognized two ways in which there

could be commonality in an employment discrimination class action:

> First, if the employer "used a biased testing procedure to evaluate both
> applicants for employment and incumbent employees, a class action
> on behalf of every applicant or employee who might have been
> prejudiced by the test clearly would satisfy the commonality and
> typicality requirements of Rule 23(a)." Gen. Tel. Co. of Sw. v. Falcon,
> 457 U.S. 147, 159, n. 15 (1982).  Second, "[s]ignificant proof that an
> employer operated under a general policy of discrimination
> conceivably could justify a class of both applicants and employees if

39

the discrimination manifested itself in hiring and promotion practices
in the same general fashion, such as through entirely subjective
decisionmaking processes." <u>IbId.</u>

<u>Id.</u> at 353.  Plaintiffs argue they have sufficiently pled the commonality

requirement through this second standard—significant proof of a general policy of

discrimination—for purposes their disparate impact and disparate treatment class

claims.  (Dkt. # 23 at 49.)

      Plaintiffs rely on <u>Chen-Oster v. Goldman, Sachs & Co.</u>, 325 F.R.D. 55

(S.D.N.Y. 2018), which held that "[m]anagerial discretion does not destroy

Plaintiffs' [class] claims."  <u>Id.</u> at 75  The court reasoned that it is sufficient to

[plead] that every plaintiff was subjected to the same employer-wide policy to

establish commonality.  <u>Id.</u>  Here, Plaintiffs contend that they have identified

"specific facially neutral policies ("common mode") that relate to compensation,

promotion, and appointments and that the use of these had, consistently and over a

period of many years, resulted in discriminatorily disparate experiences."  (Dkt.

# 23 at 49.)

      Defendants rely on <u>Moussouris v. Microsoft Corp.</u>, No. C15-

1483JLR, 2018 WL 3328418, at *16 (W.D. Wash. June 25, 2018), aff'd, 799 F.

App'x 459 (9th Cir. 2019), which found that the plaintiffs did not show that their

disparate impact claims depend upon a common contention.  <u>Id.</u> at * 18.  There, the

court surmised that "the crux of the commonality inquiry for a system of discretion

lies in whether lower-level supervisors operate under 'a common mode of exercising discretion'—put differently, whether some company-wide policy provides sufficient 'common direction' such that individual exercises of discretion nonetheless produce a common answer to the question 'why was I disfavored.'" Id. at * 16. The court also identified several factors used in determining whether a common mode of exercising discretion pervades an entire company. Id. Those factors include: (1) the nature of the purported class; (2) the process through which discretion is exercised; (3) the criteria governing the discretion; and (4) the involvement of upper management. Id. The Court finds these factors to be instructive in determining whether Plaintiffs have alleged a sufficient common mode for Rule 23(a)(2) purposes.

First, the Court looks to the nature of the purported class. Id. Here, the proposed Class Members include "all Hispanic faculty." (Dkt. # 12 at 1.) At oral argument, Plaintiffs appear to limit faculty to mean Hispanic professors at UT Austin. This factor supports a conclusion that there may be a common mode as all the proposed class members are in "closely related" positions that share "a uniform job description across the class." See Ellis v. Costco Wholesale Corp., 285 F.R.D. 492, 509 (N.D. Cal. 2012).

"Second, courts look to what procedures govern the discretion and analyze the rigidity of the process through which discretion is exercised. Simply

41

showing a process in which discretion would be exercised is insufficient to establish commonality." Moussouris, 2018 WL 3328418, at *16. Plaintiffs argue they have identified "unremedied" University-wide policies regarding the decision-making processes for compensation, promotion, and appointments. (Dkt. # 23 at 49–50.) Moreover, Plaintiffs maintain that UT's President is responsible under the identified policies to be the final reviewer and approver of all decisions related to compensation, promotions, and appointments. (Id. at 48, n.1.) Plaintiffs rely on Rule 2-2160, which provides that the UT president, Chancellor of the UT System and Board of Regents are responsible for reviewing, approving, and confirming all salary rates and promotion decisions and that the "president may accept, reject, or modify all recommendations forwarded and may make decisions with regard to salary increases . . ." (Dkt. # 12 at 7.)

Defendants contend that even though Plaintiffs identified specific policies granting deans and department chairs with subjective decision-making on employment matters, UT Austin has at least 19 deans and 98 departments overall, each managed by a separate department chair. (Dkt. # 17 at 14, 45.) Each dean or department chair is tasked with their own subjective decision making.

This case is unlike Ellis v. Costco Wholesale Corp., where the court found that the senior management's participation in and influence over the promotion process warranted a finding that there was a common, companywide

42

promotion system.  Ellis, 285 F.R.D. at 513–14.  Instead, this case is more akin to

Moussouri, where the process identified by Plaintiffs reveals only various stages or

phase during which individual decision-makers at UT Austin exercise their

discretion.  See Moussouris, 2018 WL 3328418, at *19 ("Identifying the

framework says nothing about whether the discretion itself can be said to be the

same or common." (internal citations omitted)).  Thus, this factor does not support

a conclusion that there is commonality for all proposed class members' claims.

        "Third, courts consider the criteria that govern the discretionary

decisions.  Again, whether a set of criteria creates a common mode of exercising

discretion depends on the rigidity of that criteria.  Subjective criteria, prone to

different interpretations, generally do not provide common direction."  Id. at *17.

Despite President Hartzell having "final confirmation" of pay and promotions,

Defendants claim the different departments at UT Austin apply different metrics

when evaluating professors.  (Dkt. # 17 at 9, 46.)  For example, History

Department professors may receive a raise based on their number of publications

each year while professors at other UT Austin departments may focus on other

criteria.  (Id. at 9–10.)  Another example is HOP 2-2440, which provides that

selection criteria for endowed chairs and professorships shall generally be based on

a "record of excellence", but there are no specific requirements or guidelines for

what "excellence" may mean.  (Dkt. # 12 at 8.)  This type of criteria allows for different interpretations from the different decision-makers at UT Austin.

Plaintiffs do not allege that different deans or department chairs utilize uniform or objective criteria in making promotion or pay decisions.  Indeed, Plaintiffs allege that UT's "facially neutral employment policies and practices "allow for the disregard of objective performance metrics in favor of subjective, biased, and discriminatory decision-making."  (Id. at 36.)  Thus, the challenged decision-making processes, including the failure to apply objective performance metrics, do not appear to support a showing of common direction in the way deans or department chairs exercise discretion.

Fourth, and lastly, the involvement of top management in the discretionary decision-making is a key consideration.  "But mere approval of decisions by higher-level executives, without more, falls short."  Moussouris, 2018 WL 3328418, at *18.  When "evidence establishes that the recommendations of lower level . . . managers [are] almost always accepted," this "limited oversight" does not establish top management as a common denominator.  Jones v. Nat'l Council of Young Men's Christian Associations of the United States of Am., 34 F. Supp. 3d 896 (N.D. Ill. 2014).  The Court agrees that even though higher-level personnel—in this case, President Hartzell—may approve lower-level managers'

recommendations, this fact, standing alone, is insufficient to establish commonality in a system of discretion.

Here, the parties dispute President Hartzell's level of involvement in the decision-making processes that ultimately led to the alleged disparity in pay, promotions, and endowments for Hispanic professors. Defendants characterize the UT President's role as a "rubberstamp" process whereas Plaintiffs argue the President is much more involved. However, there are no allegations that President Hartzell meaningfully engages in a review of each pay, promotion, or endowment decision. The cited UT policies provide that the UT President is responsible for "reviewing, approving and conforming" salary and promotion decision (Rule 2-2160) and "maintaining oversight of Endowments" (Regent Rule 60202). (Dkt. # 12 at 7–8). Without further allegations of a deeper involvement, these policies only point to President Hartzell's "limited oversight" and, therefore, do not establish "top management as a common denominator." This factor does not support a conclusion that Plaintiffs have alleged a sufficient common mode for Rule 23(a)(2) purposes.

In sum, Plaintiffs have failed to establish significant proof of a common policy of discrimination for their disparate impact and disparate treatment class claims. Therefore, the Court finds that there is insufficient Rule 23(a)(2)

commonality between the "answers apt to drive the resolution of the litigation."

Dukes, 564 U.S. at 349–50.

        ii.     Rule 23(b)

Even assuming *arguendo* that Plaintiffs satisfy the commonality

requirement, Defendants argue that Plaintiffs cannot certify a class under Rule

23(b)(2) as they seek individualized injunctive and declaratory relief, such as back

pay for class members.  (Dkt. # 17 at 44.)  Nor can Plaintiffs certify a class under

Rule 23(b)(3) because (1) Plaintiffs cannot satisfy the predominance criterion, (2)

the individual issues to the class claims overwhelm any efficiency gained from the

class action process, and (3) the compensatory damages sought are not fit for class

certification under Rule 23(b)(3).  (Id. at 45–46.)

Class certification under Rule 23(b)(2) applies where "the party

opposing the class has acted or refused to act on grounds that apply generally to the

class, so that final injunctive relief or corresponding declaratory relief is

appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2); Thorn v.

Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 329 (4th Cir. 2006).

Defendants highlight that Plaintiffs are seeking relief on behalf of the

Class Members for individualized monetary relief, like backpay.  (Dkt. # 17 at 45.)

In Dukes, the Supreme Court held that claims for monetary relief, such as backpay

are excluded under Rule 23(b)(2), where the monetary relief is not incidental to the

requested injunctive or declaratory relief.  <u>Dukes</u>, 564 U.S. at 360–62.  Rule

23(b)(2) applies only when a single, indivisible remedy would provide relief to

each class member.  Indeed, it appears that Plaintiffs do not contest that they

cannot seek their intended relief through a 23(b)(2) class.  The Court therefore

finds that Plaintiffs cannot meet the requirements of Rule 23(b)(2).

      Rule 23(b)(3) requires Plaintiffs to demonstrate that "questions of law

or fact common to class members predominate over any questions affecting only

individual members, and that a class action is superior to other available methods

for fairly and efficiently adjudicating the controversy."  <u>See</u> Fed. R. Civ. P.

23(b)(3); <u>Steering Comm.</u>, 461 F.3d at 601.

      iii.   <u>Predominance</u>

      To assess predominance, courts are required "to consider how a trial

on the merits would be conducted if a class were certified."  <u>Bell Atl. Corp. v.

AT&T Corp.</u>, 339 F.3d 294, 302 (5th Cir. 2003) (citation and internal quotation

marks omitted).  Rule 23(b)(3)'s predominance requirement is "far more

demanding" than the commonality under Rule 23(a) because the predominance

inquiry "tests whether proposed classes are sufficiently cohesive to warrant

adjudication by representation."  <u>Gene And Gene LLC v. BioPay LLC</u>, 541 F.3d

318, 326 (5th Cir. 2008) (quoting <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591,

623–24 (1997)).

Plaintiffs again rely on <u>Chen-Oster</u> to make the conclusory argument that they "have plead multiple common questions of fact and law that predominate over any individual issues." (Dkt. # 23 at 53.) However, Plaintiffs fail to explain how the question of whether the employment policies that relate to compensation, promotion, and appointments resulted in discriminatory experiences that predominate over individual claims. Plaintiffs also fail to explain whether the individual issues inherent to Plaintiffs' discrimination claims overwhelm any efficiency gained from the class action process.

In sum, Plaintiffs have not demonstrated through their complaint that the Rule 23(a) commonality or Rule 23(b) predominance requirements for maintaining a class action can be met. <u>See</u> <u>Delarue</u>, 2010 WL 11530499, at *2. Accordingly, the Court **GRANTS** Defendants' motion to strike the class allegations.

<u>CONCLUSION</u>

Based on the foregoing, the Court **DENIES** Plaintiff's Motion to Strike (Dkt. # 20) and **DENIES** Plaintiffs' Motion for Leave to File a Sur-Reply. (Dkt. # 29.)

The Court further **DENIES IN PART and GRANTS IN PART** Defendants' Motion to Dismiss and to Strike the Class Allegations. (Dkt. # 17.) The Court **DENIES** Defendants' motion to dismiss with respect to Plaintiffs'

48

disparate impact and disparate treatment claims under Title VII and Plaintiffs' Section 1983 claims against President Hartzell in his individual capacity.

The Court **GRANTS** Defendants' motion to dismiss Plaintiffs' retaliation claims under Title VII and all claims against Defendant Hartzell in his official capacity.  Plaintiffs' retaliation claims and all claims against Defendant Hartzell in his official capacity are therefore **DISMISSED WITHOUT PREJUDICE.**  Further, the Court **GRANTS** Defendants' motion to strike the proposed class action allegations.

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, January 13, 2025.

_____

David Alan Ezra
Senior United States District Judge